A00A1398, A00A1399. S & A INDUSTRIES, INC. v. BANK
ATLANTA et al.; and vice versa.
(543 SE2d 743)

PER CURIAM.

S & A Industries, Inc. filed suit against Bank Atlanta[1] in connection with the bank's attempts to collect on a line of credit opened by S & A. Both parties moved for summary judgment. The trial court denied S & A's motion and granted in part and denied in part the bank's motion. We now consider the parties' cross-appeals in response to that order.

S & A is a Georgia corporation engaged in hotel renovations. Daoud Shakkour is the president of the company and the third-party defendant in this action. In early 1996, Shakkour agreed to loan $20,000 to David Wade, a business acquaintance, to enable him to meet the payroll at his company, Wade Electric Supply Company, Inc. Wade was the president and sole shareholder of Wade Electric. Shakkour gave Wade a check without requiring any written loan agreement, without requiring interest and without obtaining any information regarding Wade Electric's financial situation.

At that time, Wade Electric owed money to First Capital Bank and was in the process of negotiating with Bank Atlanta for a replacement loan of $400,000. The loan was to be guaranteed by the U. S. Small Business Administration. In the course of these negotiations, it was determined that Wade Electric needed an infusion of $300,000 to qualify for the SBA loan. Shakkour was approached to put up the necessary money for Wade Electric. Shakkour had previously written a letter to First Capital Bank stating that he intended to make a $300,000 capital investment in Wade's company, although at deposition he stated that he signed the letter in blank.

On February 21, 1996, Bank Atlanta issued a loan commitment

---

[1] S & A also named David Wade, president of Wade Electric Supply Company, Inc., as a defendant in this action.

letter, agreeing to make Wade Electric a $400,000 SBA loan. The loan commitment was expressly contingent, however, on the receipt by Bank Atlanta of "satisfactory evidence that not less than $300,000 cash has been injected into the business as an equity injection from Daoud Shakkour, a Standby Creditor." To facilitate this transaction, Wade Electric opened an account at Bank Atlanta. And in that regard, the company provided Bank Atlanta with a corporate resolution showing that Wade and Shakkour, along with two other individuals, were authorized to withdraw funds from the account.

At around the same time, S & A had applied for and received a commitment from Bank Atlanta to increase the company's line of credit from $200,000 to $400,000. On March 6, 1996, at the closing on the increased line of credit, Shakkour signed, on behalf of S & A, a promissory note in the amount of $402,000.[2] He also signed a personal guaranty and gave the bank a security deed on the property he owned at 141 Sams Street in Decatur.

Subsequently $300,000 was drawn from S & A's line of credit and deposited into Wade Electric's account at Bank Atlanta. Bank Atlanta contends that the funds were withdrawn at Shakkour's authorization with the intention of making a capital investment in Wade Electric so that it could qualify for the SBA loan. But S & A contends that Shakkour made that authorization only because Purdy Richardson, president of Bank Atlanta, assured him that he would get the money back at the closing on Wade Electric's SBA loan. In his deposition, Shakkour testified that shortly after the closing on S & A's loan, he met with Wade and Richardson to discuss the SBA loan. He states that he learned for the first time at this meeting that Wade Electric required $300,000 to close the loan. Although initially reluctant, Shakkour states that he agreed to the loan because Richardson told him that the money was going to stay in the bank and merely be used to show that Wade Electric had the necessary funds available to it at the time of closing. According to Shakkour, Richardson said that after the closing, the funds would be returned to S & A's account. Richardson denies making any such representations.

Wade Electric's SBA loan closed on March 21, 1996. The previous day, Shakkour had signed the SBA-required standby agreement, acknowledging that the $300,000 was a loan and agreeing that he would not attempt to collect on this loan, with certain exceptions, without the prior written consent of Bank Atlanta.

Shortly after the loan closed, Wade Electric withdrew the $300,000 from its Bank Atlanta account in order to pay off certain

---

[2] S & A had furnished Bank Atlanta with a corporate resolution authorizing the increase in the line of credit from $200,000 to $400,000 and giving Shakkour authority to sign a $402,000 note binding the corporation.

outstanding corporate debts. Subsequently, Wade Electric filed a bankruptcy petition and obtained a discharge of its corporate debt under Chapter 7. Despite the fact that Shakkour obtained a promissory note from Wade Electric two months earlier on all monies loaned, neither Shakkour nor S & A asserted their interest in the bankruptcy proceedings.

Meanwhile, interest payments began to accrue on the S & A line of credit beginning June 6, 1996. And on June 14, Bank Atlanta began sending S & A delinquent payment notices. In response, S & A made 11 monthly payments of interest totaling $29,697.75 between June 1996 and March 1997. None of the payments were made under objection or protest. The line of credit matured on March 6, 1997, but S & A and Bank Atlanta entered into a modification agreement whereby the maturity date was extended until June 30, 1997. Nevertheless, S & A failed to repay the outstanding balance due on the note and subsequently filed this action. Bank Atlanta, in turn, asserted a counterclaim and filed a third-party complaint against Shakkour. S & A appeals from the denial of its motion for summary judgment, and Bank Atlanta appeals from the partial denial of its motion.

### *Case No. A00A1398*

We first address S & A's appeal and must note initially that S & A has failed to comply with Court of Appeals Rule 27 (c) (1), which requires that the sequence of argument in a brief follow the enumerations of error and be numbered accordingly. S & A enumerates ten errors, but the sections of its argument are not numbered, and many of the headings do not directly correlate with the enumerated errors. As we have held:

> Rule 27 (c) (1) is more than a mere formality. It is a requirement which this Court imposes to ensure that all enumerations of error are addressed and to facilitate review of each enumeration. By failing to comply with the rule, the appellant has hindered the Court's review of [its] assertions and has risked the possibility that certain enumerations will not be addressed. Accordingly, to the extent that we are able to discern which of the enumerations are supported in the brief by citation of authority or argument, we will address those enumerations. Pursuant to Court of Appeals Rule 27 (c) (2), however, all other enumerations will be treated as abandoned.

(Citation and punctuation omitted.) *Desmond v. Troncalli Mitsubishi,* 243 Ga. App. 71-72 (532 SE2d 463) (2000).

1. S & A contends that the terms of the note were usurious and that the trial court erred in denying its motion for summary judgment on this issue. We reject that contention for the reasons set forth in the special concurrences below.

2. S & A also argues that the trial court erred in finding that the Statute of Frauds did not apply to the oral authorization to withdraw $300,000 from its line of credit. S & A asserts that the oral withdrawal was a commitment to lend money and thus was required to be in writing under the Statute of Frauds. OCGA § 13-5-30 (7). The trial court found, however, that the transaction at issue in the case was the loan by Bank Atlanta to S & A and that transaction was evidenced by the written promissory note signed by Shakkour on behalf of his corporation. Therefore, the trial court reasoned, no violation of the Statute of Frauds occurred. We agree.

When Shakkour verbally authorized the withdrawal of $300,000 from S & A's line of credit, he simply executed the loan to which the bank had already contractually agreed and which was controlled by the parties' promissory note. It is the enforcement of that note which Bank Atlanta seeks and which S & A seeks to avoid. And it is undisputed that the note meets the requirements of the Statute of Frauds. OCGA § 13-5-30 (7).

Nothing in that promissory note required that authorizations for withdrawals be in writing. And Shakkour has pointed to no other document requiring such a written authorization. In fact, the record shows that both Shakkour and his business partner had given oral authorization for withdrawals from the account, both prior to and after the $300,000 withdrawal at issue in this case.

Nor does the lack of any contemporaneous written agreement evidencing the transfer of $300,000 from Shakkour to Wade Electric[3] affect the validity of the S & A promissory note. Although in the absence of such a writing, Shakkour may have had difficulty enforcing Wade Electric's obligation to repay that amount, it has no effect on S & A's obligations under the note to Bank Atlanta.

3. S & A also contends that the trial court erred in holding that evidence of Richardson's representations, which Shakkour claims induced him to authorize the $300,000 withdrawal, were inadmissible under the parol evidence rule. S & A asserts that because the authorization to withdraw the $300,000 was oral, the parol evidence rule does not bar such evidence.

But in making this argument, S & A is, in effect, simply attempting to avoid its obligations under the promissory note. To the extent

---

[3] S & A asserts that the trial court erroneously describes this transfer as a capital investment. But whether the transaction is termed a loan or a capital investment has no effect on the terms of the underlying promissory note.

that S & A is relying on these conversations "to add to, take from or vary" the terms of its promissory note with Bank Atlanta, it is barred by the parol evidence rule.[4] OCGA § 13-2-2 (1). See, e.g., *Devin Lamplighter, Ltd. v. American Gen. Finance*, 206 Ga. App. 747, 749 (2) (426 SE2d 645) (1992) (parol evidence will not be used to impose conditions which are not apparent from the face of a note showing an unconditional promise); *Ga. Higher Ed. Assistance Corp. v. Geldon*, 187 Ga. App. 798 (371 SE2d 449) (1988) ("It is axiomatic that parol evidence cannot be admitted to vary or alter the terms of a promissory note.").[5]

It is true that S & A asserted a claim of fraud and the parol evidence rule applies only in the absence of fraud, mistake or accident. See, e.g., *Vandegriff v. Hamilton*, 238 Ga. App. 603, 604 (519 SE2d 702) (1999). But the trial court granted Bank Atlanta's motion for summary judgment on S & A's fraud claim. Although S & A enumerated this ruling as error, it failed to support this enumeration with any argument or citation to authority, and it is deemed abandoned under Court of Appeals Rule 27 (c). See *Desmond v. Troncalli Mitsubishi*, 243 Ga. App. 71.

Therefore, any oral representations by the bank with regard to the withdrawal cannot be considered to alter the terms of the note. And the trial court did consider evidence of the conversation in ruling on S & A's tort claims, where such evidence was relevant. Therefore, we find no error.

4. S & A further asserts that the trial court erred in granting Bank Atlanta summary judgment on its claim of negligence. S & A asserted that the bank negligently failed to return the $300,000 withdrawal following the closing on Wade Electric's SBA loan.

We note that to the extent that S & A is asserting a claim for negligent breach of an oral contract, that claim fails:

> A defendant's mere negligent performance of a contractual duty does not create a tort cause of action; rather, a defendant's breach of a contract may give rise to a tort cause of action only if the defendant has also breached an independent duty created by statute or common law.

(Citation omitted.) *Traina Enterprises v. RaceTrac Petroleum*, 241 Ga. App. 18, 19-20 (1) (525 SE2d 712) (1999).

---

[4] Moreover, the promissory note itself provides that any modifications of the agreement must be in writing.

[5] A corollary to that axiom is that there is no bar to evidence that does not vary or alter the terms of the note. Therefore, the parol evidence did not bar evidence of the oral authorization itself because the authorization did not vary or alter the terms of the parties' note, but rather effectuated those terms.

Accordingly, in making this argument, S & A relies upon the common law rule regarding voluntary undertakings: "Where one undertakes an act which he has no duty to perform *and another reasonably relies upon that undertaking*, the act must generally be performed with ordinary and reasonable care. [Cit.]" (Emphasis supplied.) *Stelts v. Epperson*, 201 Ga. App. 405, 407 (411 SE2d 281) (1981). And this is true even though the undertaking was completely gratuitous and no consideration existed for the promise or undertaking so as to support a contractual claim. Id.

Because this claim was decided on Bank Atlanta's motion for summary judgment, we must view the evidence with all reasonable inferences and conclusions in favor of S & A. *Lamb v. Salvage Disposal Co. &c.*, 244 Ga. App. 193 (535 SE2d 258) (2000). Therefore, we must assume that Richardson told Shakkour that the $300,000 withdrawal on S & A's line of credit would be returned at the Wade Electric closing and further assume that this statement is binding upon Bank Atlanta itself.

Even relying upon these assumptions, however, S & A must establish that Shakkour reasonably relied upon Richardson's statement. But Shakkour signed a corporate resolution that authorized three of Wade Electric's officers and Shakkour himself to withdraw funds from the Wade Electric bank account. Although Shakkour contends that he does not recall signing the authorization, he does not dispute that his signature appears on the document. And even though Shakkour speculated that he may have signed the document in blank, he must be charged with knowledge of its contents. See *Hall v. World Omni Leasing*, 209 Ga. App. 115, 117 (2) (433 SE2d 297) (1993). Therefore, at the time Shakkour authorized the withdrawal of $300,000 from the S & A account, he knew the funds were being transferred to the Wade Electric account, even if just for the purposes of the SBA loan. And he knew that Wade Electric could access those funds. Moreover, under that authorization, Shakkour himself had the authority to access the account and, thus presumably, could have obtained the return of the money. Under these circumstances, we hold as a matter of law that Shakkour could not have reasonably relied upon any undertaking or representations made by Richardson on behalf of the bank to return the funds to S & A. See generally *Presto v. Sandoz Pharmaceuticals Corp.*, 226 Ga. App. 547, 549 (1) (487 SE2d 70) (1997).

5. S & A also asserts that the trial court erred in denying its motion for partial summary judgment on Bank Atlanta's claim for attorney fees.

(a) The company first contends that it should not be held liable for attorney fees because Bank Atlanta failed to give the required notice under OCGA § 13-1-11. But based upon our review of the

bank's August 27, 1997 notice letter, we conclude that the bank substantially complied with the notice provisions of OCGA § 13-1-11. The language of the letter was sufficient to put S & A on notice of the bank's intent to collect attorney fees under the note and to give S & A the opportunity to pay the debt without incurring such fees. The notice was, therefore, sufficient. See *Gen. Elec. Credit Corp. &c. v. Brooks*, 242 Ga. 109, 118-119 (249 SE2d 596) (1978).

(b) S & A next asserts that Bank Atlanta's recovery of attorney fees should be limited to the fees actually incurred up to the statutory maximum of 15 percent of principal and interest. We agree.

OCGA § 13-1-11 (a) (1) provides for the enforcement of attorney fees provisions in promissory notes "up to but not in excess of 15 percent of the principal and interest owing" on the note, provided the note is collected by or through an attorney after maturity. Accordingly, so long as the attorney fee provision of a promissory note does not violate the strictures of OCGA § 13-1-11 (a), it is enforceable. But the statute does not mandate the recovery of 15 percent attorney fees in every case.

Here, S & A agreed that if Bank Atlanta hired an attorney to collect the promissory note, S & A would "pay any fee, not to exceed 15 percent of the principal and interest then owed that [Bank Atlanta incurred], plus court costs. . . ." Under this language, S & A is obligated to pay only attorney fees actually incurred by the bank up to 15 percent of the principal and interest. Therefore, the bank's maximum recovery for attorney fees is 15 percent, and it must establish that it has actually incurred fees in that amount in order to recover the maximum. But see *Rodgers v. First Union Nat. Bank &c.*, 220 Ga. App. 821, 824 (2) (470 SE2d 246) (1996) (allowing recovery of 15 percent attorney fees where contract so provided).

Therefore, because we find that if Bank Atlanta can establish liability under the promissory note, it would be entitled to recover actual attorney fees incurred up to the 15 percent limit set forth in the note, we hold that the trial court properly denied S & A's motion for partial summary judgment on this ground.

(c) S & A also contends that Bank Atlanta should be precluded from recovering its attorney fees because to date it has failed to produce documents showing the fees it has incurred. We find no error in the trial court's failure to grant S & A's motion on this ground. Prior to the summary judgment order, Bank Atlanta was contending that it was entitled to a flat 15 percent attorney fee without having to prove actual fees incurred. The parties must now proceed in light of our affirmance of the trial court's order.

## Case No. A00A1399

6. Bank Atlanta contends that the trial court erred in failing to address its summary judgment motion as to S & A's claim for attorney fees under OCGA §§ 13-6-11 and 9-15-14. The bank asks us to reverse the trial court's order to the extent that it fails to grant its motion for summary judgment on these issues.

The final section of the trial court's order states that it is addressing "Counts VIII, XVIII, XIX, XX and X" of S & A's complaint headed, respectively, Statute of Frauds, Lack of Mutuality, Lack of Consideration, Promissory Estoppel and Note Not a Negotiable Instrument. The trial court granted Bank Atlanta's motion for summary judgment on each of these counts. Then, under the same heading, the order reads: "Upon a thorough review of the record, S & A's claims of bad faith and for attorneys fees and litigation expenses pursuant to OCGA § 9-15-14 (Counts XXIII and XVI, respectively) are also hereby DENIED."

This language, therefore, explicitly denies S & A the right to pursue its claims for attorney fees. And although the order does not specifically rule on Bank Atlanta's motion for summary judgment as to these two counts, the only possible construction to be placed on this language, especially in light of the trial court's other rulings, is that the trial court intended to grant summary judgment to the bank on S & A's attorney fees claims. Therefore, no action on the part of this Court is required.

7. Bank Atlanta also contends that the trial court erred in holding that a jury issue existed as to whether Shakkour was authorized to withdraw $300,000 in corporate funds in order to make a personal loan.

Although Shakkour as president of S & A may have had actual or apparent authority to authorize a withdrawal from the corporate account for corporate uses, we agree with the trial court that a jury issue exists as to whether he had authority to withdraw such funds for his own personal use. A question exists as to whether Bank Atlanta was aware that the loan was from Shakkour personally, and thus whether the bank was entitled to rely on Shakkour's apparent authority to bind the corporation. For example, the bank's loan commitment to Wade Electric was expressly made contingent upon "satisfactory evidence that not less than $300,000 cash has been injected into the business as an equity injection from *Daoud Shakkour*, a Standby Creditor." (Emphasis supplied.) And no evidence exists of a corporate authorization specifically approving the loan of corporate funds to Wade Electric. Thus, we adhere to the rule that "[q]uestions of the existence and extent of an agent's authority are generally for the triers of fact." (Citations and punctuation omitted.) *Hunter v.*

*Roberts*, 199 Ga. App. 318, 319 (2) (404 SE2d 645) (1991).

Similarly, a further jury issue exists as to whether S & A's later actions served to ratify the withdrawal. See *Rains v. Dolphin Mtg. Corp.*, 241 Ga. App. 611, 614-615 (4) (525 SE2d 370) (1999) ("Whether a ratification occurred is generally a question of fact for the jury. [Cit.]").

Accordingly, we affirm the trial court's denial of Bank Atlanta's motion on this ground.

*Judgment affirmed. Johnson, C. J., Pope, P. J., Andrews, P. J., Blackburn, P. J., Smith, P. J., Ruffin, Eldridge, Barnes, Miller, Ellington, Phipps and Mikell, JJ., concur specially.*

POPE, Presiding Judge, concurring specially.

I concur fully with the per curiam opinion and concur specially with respect to Division 1 because I do not think the terms of this loan are usurious.

OCGA § 7-4-18 (a) sets out the criminal penalty for usury and provides that no loan shall charge "any rate of interest greater than 5 percent per month." The Supreme Court has held that any loan violating this section is illegal and results in the lender's forfeiture of interest, but not principal, on the loan. *Norris v. Sigler Daisy Corp.*, 260 Ga. 271, 272 (1) (392 SE2d 242) (1990).

But the criminal usury statute must be read in conjunction with OCGA § 7-4-2, which sets out the legal rate of interest. Under OCGA § 7-4-2 (a) (1) (A), the legal rate of interest of seven percent per annum applies where a rate percent is not established by written contract. And under this subsection, the parties to a loan of more than $3,000 and less than $250,000 are allowed to establish any rate of interest in their contract subject to the usury provisions of OCGA § 7-4-18.

The language of OCGA § 7-4-2 (a) (1) (B), however, provides that parties to a loan of $250,000 or more may establish any rate of interest and does not specifically invoke the limitations of OCGA § 7-4-18. Relying on this omission, the trial court held that OCGA § 7-4-18 does not apply to loans of $250,000 or more and thus did not apply to S & A's loan in this case.

The prior opinions of this Court are in conflict as to whether the criminal usury statutes apply to loans of $250,000 or more. In at least one case, this Court has applied the criminal usury law to loans exceeding that amount. See *First Alliance Bank v. Westover, Inc.*, 222 Ga. App. 524, 526-527 (474 SE2d 717) (1996) (holding that discount on $1.65 million loan did not render loan usurious). But in *Barton v. Marubeni America Corp.*, 204 Ga. App. 346, 347 (419 SE2d 342) (1992), this Court held, without analysis, that Georgia's usury provisions did not apply to a note in excess of $2.3 million. See also *MOM*

*Corp. v. Chattahoochee Bank,* 203 Ga. App. 847 (2) (418 SE2d 74) (1992) (holding interest on loan was not usurious per se, but also noting language of OCGA § 7-4-2 (a) (1) (B)).

A review of the legislative history of these statutes compels the conclusion that loans of $250,000 or more are subject to Georgia's criminal usury statute. In construing the two Code sections together, I adhere to the primary rule of statutory construction and look to the legislative history to determine the General Assembly's intent: "In all interpretations of statutes, the courts shall look diligently [to] the intention of the General Assembly, keeping in view at all times the old law, the evil, and the remedy." OCGA § 1-3-1 (a).

Prior to 1983, in addition to setting the legal rate of interest at seven percent, OCGA § 7-4-2 provided that 10.5 percent would be the maximum rate of interest allowable on consumer loans. Ga. L. 1979, p. 355, § 1. In 1983, OCGA § 7-4-2 was amended to allow lenders on loans of over $3,000 to charge, subject to the usury provisions of OCGA § 7-4-18, "any rate of interest, expressed in simple interest terms as of the date of the evidence of the indebtedness." Ga. L. 1983, p. 1146, § 1.[6] At the same time, OCGA § 7-4-18 was amended to add subsection (c), which provides that "[n]othing contained in Code Section 7-4-2 . . . shall be construed to amend or modify the provisions of this Code section." Ga. L. 1983, p. 1146, § 5. Thus, these amendments made the two statutes consistent and clarified that the usury provisions applied to all loans covered by OCGA § 7-4-2.

In 1988, OCGA § 7-4-2 was again amended to break subsection (a) (1) into the three current subparts (A), (B) and (C). The preamble of the amendment provides that it was intended, in part, "to provide that the rate of interest established by written contract on transactions of $250,000.00 or more may be expressed in simple interest terms *or otherwise.*" (Emphasis supplied.) Ga. L. 1988, p. 534. After this amendment, therefore, under subpart (A), parties to loans of more than $3,000 and less than $250,000 must continue to express the interest rate in "simple interest terms as of the date of the evidence of the indebtedness," while under subpart (B), the interest rate on transactions of $250,000 or more can be expressed in something other than simple interest. Ga. L. 1988, p. 534, § 1. But as the preamble makes clear, nothing in this amendment was intended to remove loans of $250,000 or more from the protections of Georgia's usury statute. Moreover, when the 1988 revisions were made, the legislature retained the language in OCGA § 7-4-18 stating that nothing in OCGA § 7-4-2 "shall be construed to amend or modify the provisions

---

[6] In this same amendment, a 16 percent interest cap was placed on all loans involving $3,000 or less. Ga. L. 1983, p. 1146, § 1.

of this Code section," indicating that the usury provisions should continue to control. OCGA § 7-4-18 (c).

Thus, while Judge Miller's special concurrence focuses upon the legislature's omissions in the 1988 revisions to OCGA § 7-4-2, I am guided by the stated purpose of those revisions. And accordingly, I would hold that OCGA § 7-4-18 applies to the S & A loan and would overrule *Barton v. Marubeni America Corp.*, supra, to the extent that it holds that Georgia's usury law does not apply to loans of $250,000 or more. And although Judge Miller's special concurrence invokes stare decisis in upholding *Barton*, I note that the *Barton* case has been cited only once on another ground and has never been relied upon for the conclusory statement that the $2.3 million loan in that case was "outside the provisions of Georgia's usury statute." 204 Ga. App. at 347. Further, it appears that *Barton* may not have been heavily relied upon in the business community as neither business entity in this case cited the opinion in its brief.

S & A argues that the trial court erred in calculating whether the interest and charges on the S & A loan were usurious. Under the terms of the parties' note, interest accrued at two percent above Bank Atlanta's prime rate, which brought the interest rate to between 10.25 percent and 10.5 percent per annum over the loan term. The note also provided that following the maturity date of March 6, 1997, interest would accrue at a "post maturity" rate of 18 percent per annum, or 1.5 percent per month. The note further provided for a one-time late charge of five percent on any late payments. Bank Atlanta applied this charge to the $320,000 principal balance[7] owing at maturity and assessed S & A a late charge of $16,000.

S & A contends that this five percent late charge, incurred in July 1997 after maturity, was usurious when coupled with the 1.5 percent post-maturity monthly interest rate accruing at that time. The company argues that the two charges amounted to interest of 6.5 percent in that one month, thus exceeding the five percent per month limit of OCGA § 7-4-18.

In determining whether a loan is usurious, the definition of interest under OCGA § 7-4-18 applies. *Norris v. Sigler Daisy Corp.*, 260 Ga. at 272 (2). That section prohibits the payment of interest in excess of five percent per month "either directly or indirectly, by way of commission for advances, discount, exchange, or the purchase of salary or wages; by notarial or other fees; or by any contract, contrivance, or device whatsoever. . . ." OCGA § 7-4-18 (a). Here, the late

---

[7] This balance also reflects three additional draws on the line of credit — $3,642.30 on March 6, 1996, to cover closing costs on the loan; $40,000 in April 1996; and $75,000 on December 20, 1996 — and two principal reduction payments: $20,000 on October 29, 1996, and $78,642.30 on January 23, 1997.

charge, whether it is considered a "fee" or a "contract, contrivance or device," was a cost incurred by S & A for the use of the funds loaned by Bank Atlanta. And though the charge was not incurred until after the loan matured, S & A still retained the use of those funds at that time. See generally *Williams v. Powell*, 214 Ga. App. 216, 218 (2) (447 SE2d 45) (1994) ("Interest is calculated on amounts of which the borrower had use."). Therefore, the late charge falls within the definition of interest under OCGA § 7-4-18 and must be included in testing the loan terms for usury.

And although S & A argues that we should determine whether the loan was usurious by looking only at the month in which the one-time late charge was assessed, our Supreme Court has rejected a similar argument. In a case involving allegedly usurious front-end points and fees, the Court held that usury must be determined by measuring the total interest paid over the entire loan period:

> [(1)] [B]ecause the interest, including front-end points and fees on a fixed-term, fixed-rate loan induces the lender to make the loan for the entire loan period and not for any one month or year, [(2)] because the borrower has the use of the amount loaned for the entire loan period, and [(3)] because the usury penalty applies to the interest for the entire contract, [cits.], it seems reasonable that the loan has to be tested for usury based on interest charged for the entire loan period.

*Fleet Finance &c. v. Jones*, 263 Ga. 228, 232 (3) (430 SE2d 352) (1993).

Here, (1) the late charge presumably served as an inducement for Bank Atlanta to make the loan over the entire loan term and not in any one month, as it provided additional protection for the bank should S & A not repay the loan in a timely fashion; (2) S & A had the use of the bank's funds over the entire loan term and retained the use of the funds even after the term expired; and (3) if the note were found usurious, Bank Atlanta would forfeit all interest on the note over the life of the loan as provided under the usury laws. See *Norris v. Sigler Daisy Corp.*, 260 Ga. at 272-274 (1), (4). Therefore, it is reasonable for the loan in this case to be tested for usury based upon interest charged over the entire loan period, and I would reject S & A's argument that we must look only at the month of July 1997 in determining usury.

S & A argues, however, that the formula for calculating usury laid out by the Supreme Court in *Norris* and *Fleet Finance* should not apply here because the late charge was not incurred until after the loan matured and the post-maturity term, with interest accruing at

18 percent, is not defined. Although the late charge was not incurred until the end of the loan, it was a charge anticipated at the beginning of the loan and an inducement for the bank to lend its money. Therefore, the loan could be tested for usury based upon the late charge and the 10.25 to 10.5 percent interest paid over the 14-month modified loan term. Alternatively, the late charge could be considered in conjunction with the total interest paid, both pre-maturity and post-maturity, and measured over the entire period during which S & A retained use of the bank's money. See generally *Williams v. Powell*, 214 Ga. App. at 218; *First Alliance Bank v. Westover, Inc.*, 222 Ga. App. at 527.

But it is not necessary to decide what the appropriate term would be in this case because testing the interest over any period longer than one month would bring it under the rate prohibited by OCGA § 7-4-18. Accordingly, Bank Atlanta's loan to S & A was not usurious, and thus the trial court's denial of S & A's motion for summary judgment on this issue should be affirmed.

I am authorized to state that Chief Judge Johnson, Presiding Judge Blackburn, Judge Ruffin, Judge Eldridge and Judge Ellington join in this special concurrence.

MILLER, Judge, concurring specially.

I join fully in the per curiam opinion and concur specially with respect to Division 1 because, as stated in *Barton v. Marubeni America Corp.*, 204 Ga. App. 346, 347 (419 SE2d 342) (1992), loans where the principal amount is $250,000 or more are "outside the provisions of Georgia's usury statute. See OCGA § 7-4-2 (a) (1) (B)."

Presiding Judge Pope's special concurrence argues that we should overrule *Barton*. This argument is unpersuasive for four reasons. First, *Barton* was correct. The drafters of OCGA § 7-4-2 (a) (1) (B) in 1988 very carefully *did not* reference the existing usury statute (OCGA § 7-4-18, enacted initially in 1908) as an exception to the language that loans over $250,000 could specify whatever rate they wanted. Thus, they did not intend for the existing usury statute to apply, and to the extent the usury statute had applied to such large loans, it was implicitly repealed, despite the language contained in OCGA § 7-4-18 (c). This intent is plainly clear, for those same drafters in OCGA § 7-4-2 (a) (1) (A), which concerns smaller loans, *expressly referenced* OCGA § 7-4-18 as an exception to the language that such loans could specify any interest rate. If the drafters had intended for the usury statute to apply to the larger loans covered by subpart (B), then they would have used the same exception language that they were using in subpart (A).

The one later case cited by Presiding Judge Pope's special concurrence as implying otherwise ignores *Barton* and does not address

the meaning of the language of OCGA § 7-4-2 (a) (1) (B). See *First Alliance Bank v. Westover, Inc.*, 222 Ga. App. 524 (474 SE2d 717) (1996). Rather, *First Alliance* simply *assumes* without discussion that the usury statute applies to the large loan at issue and then concludes that the loan was nevertheless not usurious. Since *First Alliance* makes no effort to overrule or even discuss *Barton*, and since *First Alliance* does not even find the loan usurious under the statute, *First Alliance*'s implied assumption that the usury statute applies to large loans is dicta, and *Barton* is still controlling precedent on its earlier express holding to the contrary that was essential to its conclusion.

Second, the apparent and logical policy behind the drafters making this distinction is that when this much money is involved, then both parties to the transaction can be presumed to be sophisticated entities with bargaining power that can negotiate whatever interest rate they want to and that the debtor is not an unsuspecting, powerless consumer that needs the protection of the usury law. Cf. *Hooks v. Cobb Center &c.*, 241 Ga. App. 305, 308 (527 SE2d 566) (1999) (sophisticated businessman had less reason to complain about adequacy of consideration). The legislature obviously concluded that if an entity wants to borrow such a large amount of money, then it and the lender should work out the market value of interest, without the meddling interference of government regulation.

Third, reversing the case law that has been outstanding for eight years would be demoralizing to the lending industry, which has faithfully relied on this clear interpretation in making these large loans. Now suddenly, without any warning, Presiding Judge Pope's special concurrence would have lenders blindsided by a reversal of a clearly understood interpretation, and the loans for millions of dollars they have lent using higher interest rates would now come into question. The Supreme Court of Georgia recently reiterated the need to adhere to precedent so as to promote the rule of law and its predictability.

> The application of the doctrine of stare decisis is essential to the performance of a well-ordered system of jurisprudence. In most instances, it is of more practical utility to have the law settled and to let it remain so, than to open it up to new constructions, as the personnel of the court may change, even though grave doubt may arise as to the correctness of the interpretation originally given to it.

(Citations omitted.) *Etkind v. Suarez*, 271 Ga. 352, 357 (5) (519 SE2d 210) (1999).

Fourth, the doctrine of stare decisis applies even more strongly

in matters of statutory construction.

> "Even those who regard 'stare decisis' with something less than enthusiasm recognize that the principle has even greater weight where the precedent relates to interpretation of a statute." A reinterpretation of a statute after the General Assembly's implicit acceptance of the original interpretation would constitute a judicial usurpation of the legislative function.

(Citations omitted.) *Etkind*, supra, 271 Ga. at 358 (5).

The Georgia General Assembly has been aware of *Barton*'s interpretation of the statute for over eight years and has done nothing to amend the statute to overrule that interpretation. In fact, in 1997 the General Assembly amended subsection (c) of this Code section to address some errors and omissions, but did nothing to change the language of subsection (a) (1) (B). Ga. L. 1997, p. 143, § 7 (20). The General Assembly obviously agrees with the longstanding interpretation. "If this Court has been wrong from the beginning, on this subject, let the legislative power be invoked to prescribe a new rule for the future"; otherwise, we must adhere to the rule long applied by our courts and so well known to the legal profession. *Etkind*, supra, 271 Ga. at 358 (5).

For these four reasons I must concur specially separately as to Division 1.

I am authorized to state that Presiding Judge Andrews, Presiding Judge Smith, Judge Barnes, Judge Phipps and Judge Mikell join in this special concurrence.

DECIDED DECEMBER 1, 2000 —
RECONSIDERATION DENIED DECEMBER 15, 2000 — ▉▉▉▉▉▉

*Smith, White, Sharma & Halpern, Larry J. White, Laurence H. Margolis*, for appellant.

*Schreeder, Wheeler & Flint, John A. Christy, Timothy C. Batten*, for appellees.

David R. Wade, *pro se*.