A07A2019, A07A2020. FIELBON DEVELOPMENT COMPANY, LLC et al. v. COLONY BANK OF HOUSTON COUNTY; and vice versa.
(660 SE2d 801)

ADAMS, Judge.

Colony Bank of Houston County filed suit to recover on promissory notes signed by Fielbon Development Company, LLC, as well as a guaranty provided by R. J. Fields on the notes. During the course of the litigation, all but one of the Fielbon notes was satisfied. Thus the trial concerned the remaining promissory note in the face amount of $116,000 and Fields' guaranty, along with counterclaims filed by Fielbon and Fields against Colony Bank for negligence, attorney fees and punitive damages.

The trial court directed a verdict against Fielbon on the note and against Fields on his guaranty in the amount of $121,770.63, representing principal and interest plus $18,265 in attorney fees. The court dismissed Fields' counterclaim, but sent Fielbon's counterclaim to the jury, which returned a verdict against the bank in the amount of $50,000, together with $25,965.50 in attorney fees for a total of $75,965.50. These cross-appeals ensued.

Fields, an experienced real estate developer, formed Fielbon with Calder Bond,[1] who had considerable construction experience from working in the concrete industry in Macon and elsewhere. The two men formed the company as a vehicle for developing subdivisions and building houses, primarily in Houston and Bibb Counties. Field held a 50 percent ownership and Bond held the remaining 50 percent

---

[1] The bank also sued Calder Bond, but he was discharged in bankruptcy.

through a company called Redlac Properties, Inc. Bond was to manage the day-to-day affairs from the company's Macon office, while Fields was to handle the financial aspects, dealing with the banks and obtaining funding, from his office in Covington. Fielbon's first project was the development of Bradshire Subdivision, which began sometime in 2002.

On or about March 15, 2003, Fielbon adopted a consent resolution giving both Fields and Bond the authority to "execute and deliver any and all instruments of any kind whatsoever to sell lots and close transactions related to the [sale] of lots in Bradshire Subdivision." Thus, as Fields acknowledged at trial, Bond could sign documents on behalf of Fielbon and could represent the company at closings. In addition, Fields and Bond had an agreement that Bond could draw $80,000 per year in living expenses on Fielbon accounts.

Sometime later in 2003, Fielbon began to transact business with Colony Bank. The company opened a checking account in June 2003, and gave Bond authority to sign checks on that account. In addition, Fielbon obtained a series of construction loans from the bank, and on June 13, 2003, Fields[2] signed a personal guaranty of Fielbon's debt. Several months later, on September 26, Fielbon entered into the promissory note at issue in this case. Bond signed the note on behalf of Fielbon, and Bill Gresham signed the note on behalf of the bank as "City President." This loan was secured by a security deed on Lot 4B in Bradshire Subdivision. Fields' guaranty also remained in place, and Fields understood that the guaranty was intended to cover such loans to Fielbon.

The bank immediately advanced Fielbon approximately $27,000 under the loan to purchase Lot 4B. The loan terms allowed Fielbon to make additional draws as construction on the lot progressed. The bank followed a percentage-of-completion method of inspection and funding for such loans. Under this method, the bank would authorize draws on the loan proceeds, after it had inspected the property to ensure that construction was progressing in proportion to the money advanced. Most of the draws on this loan were deposited directly into the Fielbon checking account at Colony Bank.[3]

Sometime in October 2003, while Gresham was on vacation, Bond came to Colony Bank and complained to Annette Alexander, Gresham's administrative assistant, that Fielbon was not getting

---

[2] Bond also signed a guaranty, but it was discharged in his bankruptcy.

[3] The evidence showed that one draw in the amount of $16,000, issued on November 18, 2003, was not deposited into this account. That draw was instead issued in the form of a certified check made payable to Fielbon, which was processed through Capital City Bank, where Fielbon also held an account.

enough money under the loan to proceed with construction. Alexander told Bond that a problem existed because the bank's inspector had reported that no construction was occurring on Lot 4B. As a result, the bank could not authorize any further draws under the loan. Alexander showed Bond that the draw sheet for the loan, which the bank used to track the bank's inspections and Fielbon's draws, indicated that Lot 4B was the loan's collateral. Bond replied that the bank's documents were in error, and that the loan was actually secured by Lot 4C in the same subdivision. Unbeknownst to the bank, however, Fielbon had previously obtained another loan from a different bank to finance construction on Lot 4C.

Bond demanded that Alexander call Gresham to convey his complaints. Alexander made the call and explained the situation. Although Alexander and Gresham have differing recollections of this conversation, it is undisputed that, at some point, the draw sheet on the loan was changed to reflect that Lot 4C was the collateral. This change was made by striking the letter "B" and writing in the letter "C" with a green pen.[4] Despite this handwritten change, no formal substitution of collateral was ever made. The bank's security interest on the loan remained in Lot 4B, as reflected in the deed to secure debt and other loan documents. Despite this discrepancy, the bank authorized subsequent draws based upon inspections it conducted on Lot 4C, not 4B. Construction proceeded apace on Lot 4C, as bank documents reflect that it was "100 percent completed" on January 29, 2004, but it appears that no construction occurred on Lot 4B.

In November 2003, Fields' Covington office began calling to request documentation on the various loans and the checking account Fielbon held with Colony Bank. Fields' employee, Nancy Barber, conducted this internal audit. On December 3, 2003, Fields came to the bank and removed Bond's authority to write checks on Fielbon's account. Even after this change, Fielbon continued to receive additional draws on the construction loan through December and into January 2004.

Fields and Fielbon filed suit against Bond in January 2004,[5] and while Fields told Gresham about the suit, he did not mention any mistake in the loan's collateral. Gresham testified that he first

---

[4] At trial Alexander denied that she made this change, although she admitted making other changes on the draw sheet in green ink. Gresham testified, however, that Alexander had previously admitted changing the lot numbers and the change appeared to be in her handwriting. Moreover, in an earlier deposition Gresham said that Alexander told him in the October 2003 telephone call that she had made this change.

[5] While Fielbon presented evidence that Bond took approximately $29,000 in draws from this loan at Colony Bank, the lawsuit against Bond contended that he had embezzled at least $700,000 in Fielbon funds from various sources.

became aware that the bank had been inspecting the wrong property in March 2004, when Fielbon refused to renew the notes. He said that Fields called him out to the subdivision and showed him Lot 4B and told him that his draw sheet was incorrect. Other evidence indicates, however, that the bank may have become aware of the issue with the collateral as early as January 2004. Sometime later, the bank sent Fielbon and Fields a ten-day demand letter for repayment of the amounts owed on the loan and then initiated this lawsuit.

## Case No. A07A2019

In Case No. A07A2019, Fielbon and Fields appeal the trial court's directed verdict on both the promissory note and Fields' guaranty. They argue, in particular, that the trial court erred in directing a verdict on Fields' increase-of-risk and novation defenses to the guaranty. They also appeal the trial court's directed verdict on Fields' counterclaim, arguing that the trial court should have allowed the claim to proceed to the jury.

1. Turning first to the directed verdict on Fielbon's promissory note, we find no error. "A plaintiff seeking to enforce a promissory note establishes a prima facie case by producing the note and showing that it was executed. Once that prima facie case has been made, the plaintiff is entitled to judgment as a matter of law unless the defendant can establish a defense." (Punctuation and footnote omitted.) *Collins v. Regions Bank*, 282 Ga. App. 725, 726 (639 SE2d 626) (2006). Colony Bank produced the note signed by Bond and demonstrated that he had the authority to sign such documents on Fielbon's behalf. Accordingly, the bank made out its prima facie case.

In defense to the note, Fielbon and Fields asserted that an issue of fact existed as to whether the note is enforceable against Fielbon because Colony Bank admitted in the pretrial order and at trial that it became aware, after the fact, that Bond had obtained loan funds in October and November 2003 for his own personal use, and not for legitimate business purposes. They also assert that no Fielbon employee ever filed a written approval or request for a draw. Additionally, they contend that Fielbon should not be liable under the note because under OCGA § 14-11-301 (c), a limited liability corporation is not liable for acts of a member that are "not apparently for the carrying on in the usual way the business or affairs" of the corporation, and Bond made personal use of some of the loan proceeds. And they argue that had Colony Bank conducted proper inspections, the funds would not have been disbursed at all.

But there is no dispute that Bond had the authority to sign the promissory note, and to make draws under the loan. Fielbon made such loans in the usual course of its business, and in fact, had a

number of such loans at Colony Bank. The evidence shows that the draws were either deposited directly into Fielbon's checking account at the bank or issued to Fielbon in the form of a certified check. Fielbon granted Bond the authority to disburse funds from the checking account and to draw $80,000 in funds for his own living expenses. Thus, Bond had the authority to bind Fielbon under the note, to disburse the loan proceeds and to withdraw Fielbon funds for his own personal use. Nothing in Bond's actions in connection with the loan was so dissimilar from the acts the corporation had authorized him to perform as to make them "not apparently for the carrying on in the usual way the business or affairs" of the corporation. OCGA § 14-11-301 (c), therefore, does not relieve Fielbon of liability under the note. Cf. *Stan-Rich Co. v. New York Fire & Marine Underwriters*, 120 Ga. App. 282, 284 (170 SE2d 313) (1969).

Further, the promissory note does not require a written authorization for disbursements under the loan, and Fielbon and Fields have not pointed to any other document imposing such a requirement. See *S & A Indus. v. Bank Atlanta*, 247 Ga. App. 377, 380 (2) (543 SE2d 743) (2000). It is also significant that Fielbon continued to accept draws on the loan even after it removed Bond's authority to withdraw funds from the company checking account. Although Fielbon contends that its employees never asked for such draws, but rather only asked for inspections on the company's properties, Nancy Barber testified that she requested such inspections for the purpose of obtaining a draw on the construction loan account or for the purpose of finding out if there was a draw available. In any event, it appears that after December 3, 2003, draws deposited into the Fielbon account were disbursed through checks signed by Fields and not by Bond.

Therefore, the evidence established that Colony Bank extended monies under the loan to Fielbon, which authorized agents for the company disbursed. Under these circumstances, Fielbon remains bound under the terms of the note, even in light of the company's claims of negligence against the bank. See *Ackerman v. First Nat. Bank of Grady County*, 239 Ga. App. 304, 305 (3) (521 SE2d 221) (1999). The trial court thus properly granted the bank a directed verdict on the promissory note.

2. Despite Fielbon's liability under the note, Fields contends that it was error for the trial court to direct a verdict against him on his guaranty because the bank failed to establish that the promissory note was a "debt" under the terms of the guaranty. In addition, Fields asserts that the trial court erred in directing a verdict on his defenses to the guaranty of increase of risk and novation.

(a) Fields argues that the language of the guaranty must be strictly construed, and that Colony Bank failed to establish that the

guaranty applied to the September 2003 promissory note. We agree that we must strictly construe the terms of Fields' guaranty:

> A contract of guaranty or suretyship is primarily one to pay the debt of another which may be due and payable by the principal debtor to the creditor upon default. The contract of suretyship is one of strict law; and the surety's liability will not be extended by implication or interpretation. The undertaking of a surety being stricti-juris, he cannot, in law or equity, be bound further than the very terms of his contract.

(Citations and punctuation omitted.) *Roswell Festival v. Athens Intl.*, 259 Ga. App. 445, 448 (2) (576 SE2d 908) (2003). See also OCGA § 10-7-3. And as the party relying on the guaranty, Colony Bank bore the burden of proving the existence of the guaranty and its terms. See generally *Key v. Naylor, Inc.*, 268 Ga. App. 419, 421 (1) (602 SE2d 192) (2004).

Even under such a strict construction, the guaranty in this case contains very broad language that Fields "absolutely and unconditionally guarantee[s] to [Colony Bank] the payment and performance of each and every debt, of every type and description, that [Fielbon] may now or at any time in the future owe you. . . ." The term "debt" is defined as

> all debts, liabilities, and obligations of the borrower . . . whether now existing or created or incurred in the future, due or to become due, or absolute or contingent, *except for any obligations incurred by the borrower after the date of this guaranty for which the borrower meets your standard of creditworthiness based on the borrower's own assets and income without the addition of a guaranty*, or to which, although you require the addition of a guaranty, the borrower chooses someone other than me to guaranty the obligation.

(Emphasis supplied.) Fields asserts that Colony Bank failed to prove that the promissory note did not fall into the highlighted exception because it did not establish that the company was not a borrower that met the bank's standard of creditworthiness based upon its assets and incomes, without a guaranty.

The only evidence Colony Bank presented on this issue was Gresham's testimony that in order to protect themselves on corporate loans, banks generally require a personal guaranty from the persons who own the corporation, "unless you're dealing with a blue chip company like a Coca Cola or an IBM. . . ." Gresham then stated that

Colony Bank required a personal guaranty from both Fielbon and Bond on Fielbon's loans.

Fields contends that this "generic" testimony was insufficient to carry the bank's evidentiary burden to establish that the loan was a debt under the guaranty. We disagree. Gresham testified that the bank required personal guaranties from Fielbon's individual owners, and thus Fielbon evidently was not a borrower who met the bank's "standard of creditworthiness based on the borrower's own assets and income without the addition of a guaranty." Fielbon and Fields point to no evidence that contradicts this testimony. To the contrary, they introduced into evidence a copy of the bank's loan policy in effect during the pertinent period. The section entitled "Credit Criteria and Requirements" states that the bank's approach to "newly established businesses" such as Fielbon[6] "must be a conservative one." And it provides that "[l]oans to closely held corporations should be guaranteed by the major stockholders," although the bank occasionally made exceptions for its longstanding customers. This evidence supports Gresham's testimony that guaranties would have been required for a limited liability company like Fielbon, which also was a new customer. Because Fielbon does not fall within the language of the exception, we find as a matter of law that the September 2003 promissory note is a debt covered by Fields' guaranty.

(b) Even though Fields understood that his guaranty was intended to cover such loans, he argued that he was not liable for the note in this case because the bank "changed the deal" when it authorized draws based upon its inspection of Lot 4C instead of Lot 4B. Fields based his defenses of increase of risk and novation on this allegation, and he contends that the trial court erred in directing a verdict on those defenses.

Colony Bank argued at trial that Fields had waived these defenses under the waiver clause of the guaranty, which provides:

> WAIVER — I waive, . . . to the extent permitted by law, all notices, all defenses and claims that the borrower could assert, any right to require you to pursue any remedy or seek payment from any other person before seeking payment under this agreement, and *all other defenses to the debt, except payment in full.*

(Emphasis supplied.) Fields contends, however, that the defenses of increase of risk and novation are not defenses to Fielbon's debt, but

---

[6] The policy notes that most new businesses fail within the first five years, and Fielbon had been in existence for approximately two years when the note was executed.

rather are defenses to his own obligation under the guaranty. And he asserts that he did not waive his defenses to the guaranty.

Fields' defenses of novation and increase of risk are based on the bank's actions in unilaterally changing the collateral on the loan's draw sheet from Lot 4B to Lot 4C, in failing to formally substitute the collateral and in relying upon inspections upon the wrong property to authorize draws under the loan. Thus, Fields asserts that the bank increased his risk under the promissory note by disbursing money in reliance upon construction on the wrong lot, and these actions resulted in a novation of the parties' agreement. But in signing the guaranty, Fields agreed that the bank could modify the guaranty without providing him notice or obtaining his approval by, inter alia, "releas[ing] or substitut[ing] any collateral"; "fail[ing] to perfect any security interest or otherwise impair[ing] any collateral"; "waiv[ing] or impair[ing] any right [the bank] may have against the borrower . . ."; "delay[ing] or fail[ing] to pursue enforcement of the debt"; "exercis[ing] or fail[ing] to exercise any rights [the bank has] with respect to the debt"; or "extend[ing] new credit to the borrower."

By consenting to this language Fields agreed in advance to the bank's actions and inactions in this case, even if the end result was a correspondent increase in risk to Fields. Although a surety can be discharged by an increase of risk or a novation, OCGA §§ 10-7-21 and 10-7-22, "[a] party may consent in advance to the conduct of future transactions and will not be heard to 'claim his own discharge' upon the occurrence of that conduct." (Citation and punctuation omitted.) *Panasonic Industrial Co. v. Hall*, 197 Ga. App. 860, 861 (1) (399 SE2d 733) (1990) (guarantor consented in advance to bank's actions in filing financing statement in wrong county, allowing other party to assert a superior claim to collateral). Given the language of the guaranty in this case, no issue of fact existed as to whether Fields was discharged by any increased risk or any purported novation because he agreed in advance to the risk that the bank would take such actions. Id.; *Underwood v. NationsBanc Real Estate Svc.*, 221 Ga. App. 351, 352 (471 SE2d 291) (1996); *Ramirez v. Golden*, 223 Ga. App. 610, 611 (478 SE2d 430) (1996). The trial court properly granted the bank's motion for directed verdict on Fields' guaranty.

Similarly, these provisions of the guaranty also preclude Fields' counterclaim for negligence, punitive damages and attorney fees against the bank, as these claims are based upon the same conduct upon which he based his defenses and to which he consented in advance. We therefore affirm the grant of directed verdict on Fields' counterclaim.

## Case No. A07A2020

In Case No. A07A2020, Colony Bank cross-appeals asserting that the trial court erred in sending Fielbon's counterclaim to the jury, especially the claims for punitive damages and attorney fees. In addition, the bank contends that the trial court erred in allowing the jury to consider whether Fielbon should be allowed to recover $4,500 in attorney fees paid prior to trial in settlement of a separate promissory note. Colony Bank also raises an issue as to the form of the verdict.

3. Colony Bank asserts that Fielbon's counterclaim should never have gone to the jury because Fielbon failed to demonstrate that the bank owed the company a duty independent of the parties' contract. The bank relies upon the well-settled principle that

> [a] defendant's mere negligent performance of a contractual duty does not create a tort cause of action; rather, a defendant's breach of a contract may give rise to a tort cause of action only if the defendant has also breached an independent duty created by statute or common law.

(Citation omitted.) *S & A Indus. v. Bank Atlanta*, 247 Ga. App. at 381 (4).

Fielbon argues, however, that in some circumstances a breach of contract may also constitute an independent tort, relying upon authority that

> it is axiomatic that a single act or course of conduct may constitute not only a breach of contract but an independent tort as well, if in addition to violating a contract obligation[,] it also violates a duty owed to plaintiff independent of a contract to avoid harming him.

(Citation and punctuation omitted.) *Brookview Holdings v. Suarez*, 285 Ga. App. 90, 94 (1) (645 SE2d 559) (2007). But these two lines of authority essentially assert the same legal principle: that "[a]bsent a legal duty beyond the contract, no action in tort may lie upon an alleged breach of [a] contractual duty." (Citation omitted.) *Wallace v. State Farm Fire &c. Co.*, 247 Ga. App. 95, 98 (539 SE2d 509) (2000).[7]

---

[7] An exception lies where the nonperformance or inaction under the contract "is of such a type as to create an unreasonable risk of harm to others." (Citations omitted.) *Orkin Exterminating Co. v. Stevens*, 130 Ga. App. 363, 365 (203 SE2d 587) (1973). But this is not such a case. See, e.g., *Lenny's, Inc. v. Allied Sign Erectors*, 170 Ga. App. 706, 708 (3) (318 SE2d 140) (1984) (contract breach resulted in extensive fire damage).

The negligent actions or inactions that Fielbon asserts against Colony Bank all arise out of the bank's administration of its construction loan, and the damages it claims flow directly therefrom. While evidence existed that the bank may have been negligent in managing and monitoring the loan, any duty the bank owed Fielbon in connection with the loan arose solely out of the parties' contractual relationship. And Fielbon failed to establish that the bank owed the company any duty independent of that contract in connection with the loan.[8] Accordingly, the trial court erred in failing to direct a verdict in favor of the bank on Fielbon's counterclaim, including the claim for attorney fees and punitive damages. See also *ServiceMaster Co. v. Martin*, 252 Ga. App. 751, 754-756 (2) (556 SE2d 517) (2001); *S & A Indus. v. Bank Atlanta*, 247 Ga. App. at 381 (4). Compare *Wachovia Bank &c. v. Reynolds*, 244 Ga. App. 1 (533 SE2d 743) (2000) (independent duty found where bank allowed mentally incapacitated depositor to withdraw funds from certificate of deposit set up by depositor's attorney-in-fact).

4. Colony Bank also contends that the trial court erred in allowing the jury to consider Fielbon's claim seeking to recover $4,500 in attorney fees paid to the bank in connection with a separate loan secured by Lot 2C in Bradshire Subdivision. That loan was originally one of the promissory notes at issue in ths suit, and Fielbon defended the bank's claim by asserting that the loan on Lot 2C was not in default. Nevertheless, in 2005, Fielbon sold Lot 2C, and repaid the loan. In that connection, the bank agreed to reduce the amount of attorney fees owing under the loan from the 15 percent recited in the note to a flat fee of $4,500. The parties agreed, however, that the issue of attorney fees would remain open for trial, and if the jury determined that the note had not been in default, Fielbon could recover the $4,500.

Fields testified at trial that when the bank sent him renewals of the promissory notes in March 2004, he met with Gresham to discuss the issue. During that conversation, Fields proposed to Gresham that he would pay the notes on both Lots 2C and 4C, if the bank would swear out a criminal complaint against Bond. Gresham told Fields that he would have to discuss the matter with the bank. Fields said that Gresham told him to "hold onto the notes," while the bank considered the proposal. Gresham later called Fields and told him that they were not going to be able to work things out. Fielbon's next

---

[8] Although Fielbon asserts that it was also a depositor with the bank, it has asserted no acts of negligence in connection with the handling of its checking account, other than the fact that funds were deposited into the account due to negligence in handling the loan. Fielbon cannot allege that the bank was negligent in allowing Bond to write checks on the account because he had specific authority to do so.

communication from the bank was the ten-day demand notice on the note. Despite this, Fields believed that the note on Lot 2C was not in default because Gresham told him to "hold on" to it.

But on cross-examination, Fields conceded that he "supposed" the loan was in default at the time the bank sent the demand notices and subsequently filed the lawsuit. Colony Bank contends that this admission precluded the submission of the issue to the jury. We disagree, as we find that, when considered as a whole, the evidence presented a question of fact for the jury. The trial court did not err in denying the motion for directed verdict.

5. Colony Bank next raises vague concerns that the trial court's judgment might be misconstrued to allow a setoff of the amount recovered on the bank's counterclaim against the judgments entered against both Fielbon and Fields. The bank contends that Fields is not entitled to such a setoff. In light of our holding in Division 3 above, the only remaining portion of that judgment is the $4,500 in attorney fees on the loan secured by Lot 2C.

In any event, the bank failed to raise the issue of setoff or to raise any objection to this judgment below. Thus, there is nothing for us to consider on appeal. *CPD Plastering v. Miller*, 284 Ga. App. 172, 174 (1) (643 SE2d 392) (2007); *Witty v. McNeal Agency*, 239 Ga. App. 554, 560 (3) (b) (521 SE2d 619) (1999).

*Judgment affirmed in Case No. A07A2019. Judgment affirmed in part and reversed in part in Case No. A07A2020. Andrews, P. J., and Blackburn, P. J., concur.*

DECIDED MARCH 26, 2008 —
RECONSIDERATION DENIED APRIL 9, 2008.

*Greer, Stansfield & Turner, Robert H. Stansfield*, for appellants.
*Mills & Larkey, Ben B. Mills, Jr.*, for appellee.