A06A2026. RAYBURN v. GEORGIA POWER COMPANY.
(643 SE2d 385)

BARNES, Chief Judge.

Benjamin Rayburn worked for Caffrey Construction Company as a tree cutter, and was clearing land for a new power line right of way when he was paralyzed by a falling limb. He sued Georgia Power Company, which had hired Caffrey Construction, for negligence. After extensive discovery, Georgia Power moved for summary judgment. The trial court granted the motion, and Rayburn appeals. For the reasons that follow, we affirm.

On appeal we review the trial court's grant of summary judgment de novo to determine whether the evidence, viewed in the light most favorable to the nonmoving party, demonstrates a genuine issue of material fact. Summary judgment is proper only when no issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Preferred Real Estate Equities v. Housing Systems,* 248 Ga. App. 745 (548 SE2d 646) (2001). Further, when ruling on a motion for summary judgment, a court must give the opposing party the benefit of all reasonable doubt, and the evidence and all inferences and conclusions therefrom must be construed most favorably toward the party opposing the motion. *Moore v. Goldome Credit*

[31] *Houston v. State,* 270 Ga. App. 456, 458 (1) (606 SE2d 883) (2004).

*Corp.*, 187 Ga. App. 594, 596 (370 SE2d 843) (1988). On motions for summary judgment, however, courts cannot resolve the facts or reconcile the issues. *Fletcher v. Amax, Inc.*, 160 Ga. App. 692, 695 (288 SE2d 49) (1981). When reviewing the grant or denial of a motion for summary judgment, this court conducts a de novo review of the law and the evidence. *Desai v. Silver Dollar City*, 229 Ga. App. 160, 163 (1) (493 SE2d 540) (1997).

So viewed, the record shows that Georgia Power determined that it needed to expand a substation in Glynn County to increase its capacity. The land over which Georgia Power's right of way would run was "typical coastal plain of Georgia" with wet areas, marshy areas, creeks, and some high ground with planted pine. A committee established a proposed two-mile center line for the expansion, and Georgia Power's land department crews set "control points" along the line by obtaining Global Positioning Satellite (GPS) data so that future survey work would be aligned with existing survey work. Georgia Power then hired an outside surveyor to determine the property lines and other topographical features of the center line and surrounding right of way, and Georgia Power's land department used the outside surveyor's data to fill in details on the map.

Once that map was prepared and the center line and boundaries were flagged, Georgia Power's environmental supervisor and his assistant walked through the site to flag the boundaries of the stream buffers and wetlands. The timber within those areas would be felled by hand with chain saws, and the rest of the area would be cleared with machines. The supervisor testified that, although the company could have applied to the Corps of Engineers (COE) for a permit to clear wetlands mechanically, Georgia Power's standard policy for the last 15 or 20 years required that all wetlands and stream buffers must be cleared by hand. The COE regulates the discharge of fill matter in wetlands and regulates mechanical land clearing because it destroys wetlands by disturbing the root mat underground. The COE does not regulate activities that only involve removing vegetation above ground, where the activity neither substantially disturbs the root system nor involves mechanically pushing or dragging vegetation and redepositing soil material. Hand-clearing minimizes the impact to the wetland because it does not disrupt the root mat. The company only sought a permit from the COE when it had to fill in a wetland area, as it did for .83 acres on this project to build a structure.

The Environmental Protection Division of the Georgia Department of Natural Resources (EPD) administers the National Pollution Discharge Elimination System, which tracks and regulates the amount of discharge from construction sites to control the amount of sediment in the water and reduce the impact to plants and wildlife. See OCGA § 12-5-23 (a) (1) (R), (c) (15). Each power line transmission project

requires a permit, which is obtained by filing a "Notice of Intent" that the company would be working in that area, and Georgia Power hires an outside company to monitor the rainfall and water quality during the project. The State Erosion and Sedimentation Act requires at least a 25-foot buffer to be cleared by hand on each side of a warm water stream, and at least a 50-foot buffer for trout streams, within which vegetation must be cleared by hand. OCGA § 12-7-6 (b) (15), (16).

Georgia Power's environmental supervisor testified that whether to widen the buffer was a judgment call on his part, and he did so here because he determined that the stream running through this project was sensitive. He put flags along an estimated 50-foot-wide buffer, twice the required buffer width because the bigger the buffer, the better the protection in a sensitive area. In addition to marking the stream buffer, he also marked the edges of all wetland areas within the right of way, which he determined by considering data such as the type of vegetation, soil, drift lines, and water level. A survey map of the area with construction details includes a note that says, "CAUTION: 25' buffer each side of wetlands only special selected clearing. Coordinate work with Georgia Power Company Environmental Department. Field verify." The environmental supervisor did not know who would determine the location of the 25-foot buffer from the edge of the wetlands that he flagged.

The environmental supervisor's assistant, an environmental analyst, walked the property behind the supervisor and marked in her notebook that they put 100-foot buffers on the stream. In addition to physically flagging these areas, the assistant gathered GPS data showing the wetland and stream buffer delineations and the land department used that data to generate an overlay showing the wetlands and stream buffers on the existing map. At some point, Georgia Power staff moved the wetland buffer to the edge of the right of way. It is unclear from the record who flagged the stream buffer boundary within which Rayburn was working when he was injured.

Georgia Power requested bids on the clearing project, and Caffrey Construction won the bid, having taken into account that several areas in the project had to be hand-cleared. Caffrey's first crew got behind, so in June 2003 its second crew, including Rayburn, went to Brunswick to assist. Two days after he began working on the job, Rayburn went into an area marked as a "streamside management" or buffer zone and worked for two and a half hours felling about thirty trees with a chain saw. The ground was flat and he stood ankle-deep in water. He then began cutting a tree with a fork in it. He cut one fork and turned to cut the second fork when a limb from another tree struck him from behind. Apparently the canopy of the first tree hit the

canopy of another tree and knocked off the limb. Rayburn sustained a spinal cord injury and is paralyzed from his chest down.

Rayburn sued Georgia Power, contending that the company's negligence caused his injury. After extensive discovery, including at least 11 depositions, Georgia Power moved for summary judgment. After a hearing, the trial court granted the motion, holding among other things that Rayburn's injury was "the product of a normal risk faced by persons employed to cut down trees." The court held that the decision to extend the buffer did not cause Rayburn's injury, the cause of which was either his decision to cut down the tree in the circumstance presented, or else an unforeseen occurrence for which no one was responsible. The court also declined to find that tree cutting is an "inherently dangerous" occupation or that Georgia Power directed the time and manner of Caffrey's work.

Rayburn contends on appeal that the trial court erred (1) in granting summary judgment to Georgia Power and finding as a matter of law that his injury was not caused by negligence or that he assumed the risk of injury; (2) in determining that tree cutting is not an inherently dangerous activity or that Georgia Power directed the work of the Caffrey employees; and (3) in granting summary judgment without "proper consideration" of the expert affidavits.

1. Rayburn argues that this is not a premises liability case, but a "negligent construction management" case, because Georgia Power knowingly and unnecessarily exposed Rayburn to an unreasonable risk of serious injury by requiring that certain parts of the project had to be cleared by hand instead of by machine. He asserts that the trial court erred in finding that Georgia Power was not negligent and that he assumed the risk that he could be injured.

> [T]he employer of an independent contractor owes the contractor's employees the ubiquitous duty of not imperiling their lives by his own affirmative acts of negligence. It is also the general rule that the independent contractor's employer is under no duty to take affirmative steps to guard or protect the contractor's employees against the consequences of the contractor's negligence or to provide for their safety.

(Citations and punctuation omitted.) *United States v. Aretz*, 248 Ga. 19, 24 (1), (2) (280 SE2d 345) (1981). A defendant claiming the affirmative defense of assumption of risk "must establish that the plaintiff (1) had actual knowledge of the danger; (2) understood and appreciated the risks associated with such danger; and (3) voluntarily exposed himself to those risks." (Citation omitted.) *Vaughn v. Pleasant*, 266 Ga. 862, 864 (1) (471 SE2d 866) (1996). The defense "bars recovery when it is established that a plaintiff, without coercion

of circumstances, chooses a course of action with full knowledge of its danger and while exercising a free choice as to whether to engage in the act or not." (Citations and punctuation omitted.) *Muldovan v. McEachern*, 271 Ga. 805, 807 (2) (523 SE2d 566) (1999).

Rayburn argues that Georgia Power owed him a legal duty not to expose him to unreasonable risks of harm by requiring hand-clearing in an area that could have been more safely cleared by machine, and that it breached this duty. Because he also showed that this breach of duty proximately caused his injury, he contends, the trial court erred in granting summary judgment to Georgia Power. See *Lee Street Auto Sales v. Warren*, 102 Ga. App. 345 (1) (116 SE2d 243) (1960).

Rayburn submitted evidence that clearing timber by hand was more dangerous than clearing it by machine. In fact, tree cutting is one of the most dangerous occupations in the United States. While state regulations only required a 25-foot buffer to be hand-cleared on each side of a creek, Georgia Power marked a buffer line more than 100 feet from the stream. Rayburn was injured 58 feet from the stream's edge and 38 feet from the top of the bank, in an area that he contends could have been cleared legally with heavy machinery instead of by hand. He contends that, despite the option of a safer means of tree cutting, Georgia Power "directed that the work be performed by inherently dangerous methods in extremely hazardous conditions contrary to accepted construction industry standards." Therefore, he argues, Georgia Power's decision to hand-clear this section of property regardless of the danger to Caffrey's employees makes it liable for his injury.

Pretermitting whether Rayburn established that Georgia Power owed a duty to him because it directed that the land be cleared by a dangerous method under hazardous conditions, Rayburn cannot show that Georgia Power appreciated the dangers better than he did. If a "reasonable person" would know about the foreseeable harm, then Rayburn knew about it. He was hired to cut trees, and if he thought the area was too dangerous to work in, then he could have told his supervisor so instead of proceeding to cut the tree. Caffrey's president testified that if any of his crew felt incompetent to perform a task, they could tell their supervisor and would not be forced to continue.

Rayburn himself testified that he was confident in his work, that tree cutting was "a dangerous job . . . [where] things happen every day," and that he had seen people hit by trees and trees swing the wrong way. He was not an indentured servant, and was capable of refusing the work, or at least raising the issue with his supervisor, but he did not do so. He had already felled 30 trees that morning, and the record does not show that the condition of the ground caused or

contributed to his injury. He never saw the limb that hit him, and thus he was not impeded by the standing water in any efforts to avoid the limb.

While Rayburn argues that "[i]t was the decisions and acts of GPC which directly exposed Appellant to unreasonable and foreseeable harm that is the wrong," exposing someone to harm generates liability only when the person exposed does not appreciate the harm or is helpless to avoid it, which is not the case here. Thus the doctrine of assumption of risk comes into play. Caffrey's president testified that working in standing water was standard operating procedure for the loggers. In south Georgia, he noted, the "inherent climatology is that water stands and that's a given." The ground was no more slippery, muddy, or wet than any other job in south Georgia. When asked whether standing water was apparent when the right of way was first examined, another witness replied, "of course it was. This was south Georgia." While Rayburn's experts concluded that the working conditions were "abhorrent," none of the witnesses said that the conditions were out of the ordinary for that part of the state. Rayburn cannot establish that Georgia Power breached its "ubiquitous duty of not imperiling [his life] by [its] own affirmative acts of negligence" and by doing so proximately caused Rayburn's injury. *United States v. Aretz*, supra, 248 Ga. at 24 (1).

If the entity hiring a contractor has a duty to warn of certain hazards not known by the contractor's employees, the reverse is also true; if the contractor's employees can ascertain the hazard known to the entity hiring the contractor, the contractor need not warn the employees of the hazard. See *Englehart v. OKI America*, 209 Ga. App. 151, 154 (433 SE2d 331) (1993).

Rayburn argues that, even if he knew the general risk involved in felling trees with a chain saw, he did not assume the specific risk that the particular branch that hit him would do so.

> The knowledge that a plaintiff who assumes a risk must subjectively possess is that of the specific, particular risk of harm associated with the activity or condition that proximately causes injury. The knowledge requirement does not refer to a plaintiff's comprehension of general, non-specific risks that might be associated with such conditions or activities. As stated by Dean Prosser: In its simplest and primary sense, assumption of the risk means that the plaintiff, in advance, has given his consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of injury from a known risk arising from what the defendant is to do or leave undone.

(Citation, punctuation and emphasis omitted.) *Sones v. Real Estate Dev. Group*, 270 Ga. App. 507, 509 (606 SE2d 687) (2004). In *Sones*, the plaintiff only had to anticipate that the forklift he was driving presented a danger as it was being used. A driver who chooses to drive on the wrong side of the road assumes the risk that an oncoming car will hit him, and it does not matter whether he appreciates the risk of the particular vehicle that hits him. Similarly, Rayburn did not have to know which particular limb would strike him to assume the risk that a limb might fall.

In this case, Rayburn was hired to cut trees. He had experience cutting trees. He testified that he observed the conditions and would have spoken to his supervisor if he thought they were unsafe. He already knew that cutting trees with a chain saw was hazardous, and therefore Georgia Power had no duty to warn him that he could get hurt by doing the job which presented hazards that he fully understood. He "had actual knowledge of the danger associated with the activity and appreciated the risk involved." *Liles v. Innerwork, Inc.*, 279 Ga. App. 352, 354 (2) (631 SE2d 408) (2006).

"It is a well settled principle of negligence law that the occurrence of an unfortunate event is not sufficient to authorize an inference of negligence. (Cit.) [Cit.]" *Wilkerson v. Alexander*, 208 Ga. App. 83, 85 (1) (429 SE2d 685) (1993). The trial court concluded that the injury was caused either by Rayburn's decision to cut the tree or by no one's negligence, and we find no error.

2. Rayburn argues that the trial court should have determined that Georgia Power was liable for Caffrey's negligence because the work was "inherently dangerous," and because it controlled and interfered with Caffrey's method of performing the job. OCGA § 51-2-5 provides that

> [a]n employer is liable for the negligence of a contractor: . . . (2) If, according to the employer's previous knowledge and experience, the work to be done is in its nature dangerous to others however carefully performed; [and] . . . (5) If the employer retains the right to direct or control the time and manner of executing the work or interferes and assumes control so as to create the relation of master and servant or so that an injury results which is traceable to his interference.

Pretermitting whether the trial court correctly concluded that subsection (2) of this statute protects only third parties not affiliated with either the owner or operator of a dangerous instrumentality, the statute only makes the employer liable for the *contractor's* negligence. In this case, Rayburn has not established that Caffrey's negligence led to his injury. While his experts testified that Caffrey's

safety program was lacking, the record does not show that any inadequacy in Caffrey's safety program caused Rayburn's injury. Instead, the evidence shows that his injury was caused when the crown of the tree he was cutting hit the limb of another tree, which then fell and struck Rayburn after he turned his back to the falling tree, despite the fact that a logger should watch what he cuts fall to the ground. Thus the trial court did not err in finding that Georgia Power was not liable under the theory that cutting timber by hand is inherently dangerous.

Further, even if Rayburn had established that Caffrey was negligent, the record did not show that Georgia Power retained the right to direct or control the time and manner of clearing the timber. While Rayburn contends that Georgia Power is liable because it directed which areas were to be cut by hand, Georgia Power's decisions in this regard were made before Caffrey bid on the job. The contract between Georgia Power and Caffrey designated Caffrey as an independent contractor, obligated to provide labor, supervision, equipment, tools, service and expertise necessary to clear the land. While Georgia Power retained the right under the contract to inspect Caffrey's work, the inspections were to inspect the results of the clearing work and expressly not to control the method or manner of service performance.

Once Caffrey began clearing the timber, its foremen and employees decided where to place the cuts and where to direct the tree as it fell. All the equipment belonged to Caffrey and was operated by its employees. Georgia Power's on-site supervisor visited the property once or twice a week, but did not direct the Caffrey employees in how or when to do their jobs. Caffrey's president and employees testified that changes coming from Georgia Power would go through the president, not directly to the employees. The foreman testified that he was not instructed to comply with orders from Georgia Power inspectors, and that the inspectors never told him what to do.

"[M]erely taking steps to see that the contractor carries out his agreement, by supervision of the intermediate results obtained, or reserving the right of dismissal on grounds of incompetence, is not such interference and assumption of control as will render the employer liable. [Cit.]" Perry v. Ga. Power Co., 278 Ga. App. 759, 761 (1) (629 SE2d 588) (2006). Accordingly, the trial court did not err in finding that Georgia Power did not become "so involved with the performance of the contractor's work as to become liable for Plaintiff's injuries."

3. Finally, Rayburn argues that the trial court disregarded his expert witnesses' affidavits because it made no reference to them, and asks us to review them de novo to determine whether they create a genuine issue of material fact for the jury to decide. The court's order,

however, begins by reciting that it considered the affidavits, evidence, and arguments. The fact that the court did not directly address the affidavits does not mean that it did not consider them. Further, this court reviewed all of the evidence of record de novo, including the affidavits, to determine whether summary judgment was properly granted to Georgia Power, and we find no error in the trial court's ruling.

The expert witnesses' affidavits establish that the job of felling trees by hand is dangerous, as Rayburn himself testified. The trial court is not bound, however, by the expert witnesses' legal conclusions that the job was "inherently dangerous," or that Georgia Power retained control over Caffrey's employees, which "cannot be considered as evidence on motion for summary judgment." *GE Capital Mtg. Svcs. v. Clack*, 271 Ga. 82, 84 (1) (b) (515 SE2d 619) (1999). "[I]t is well established that an expert witness may not state a legal conclusion as to the ultimate issue." *McGraw v. Smith*, 232 Ga. App. 513, 515 (2) (502 SE2d 347) (1998). Thus we find no merit in this enumeration.

*Judgment affirmed. Andrews, P. J., and Ellington, J., concur.*

DECIDED MARCH 12, 2007 — 

*McLain & Merritt, Robert B. Hill, Thomas C. Holcomb*, for appellant.

*Whelchel & McQuigg, J. Thomas Whelchel, Hawkins & Parnell, Michael J. Goldman, Assunta F. Deevey*, for appellee.