A08A0870. DAIMLERCHRYSLER MOTORS COMPANY, LLC
v. CLEMENTE.
A08A0871. DAIMLERCHRYSLER FINANCIAL SERVICES
AMERICAS, LLC v. CLEMENTE.
A08A0872. CLEMENTE v. DAIMLERCHRYSLER MOTORS
COMPANY et al.
(668 SE2d 737)

BERNES, Judge.

Metro Dodge, Inc. was an authorized Dodge dealership located in Snellville. Gina M. Clemente filed suit against Metro and several of its officers, alleging that Metro had misrepresented the condition of the vehicle she purchased at the dealership and had failed to pay off the outstanding loan on the vehicle she traded in as part of the sales transaction. Clemente later added as defendants the franchisor, DaimlerChrysler Motors Company, LLC ("Chrysler Motors"), and Metro's primary lender and creditor, DaimlerChrysler Financial Services Americas, LLC ("Chrysler Financial"), based on several theories of vicarious and direct liability.[1] The Chrysler Defendants moved for summary judgment, which the trial court initially denied but later granted in part. The trial court also amended its summary judgment order to exclude the testimony of Clemente's expert witness.

In Case Nos. A08A0870 and A08A0871, the Chrysler Defendants contend that the trial court erred in denying in part their motions for summary judgment. We agree and reverse. In Case No. A08A0872, Clemente contends that the trial court erred in excluding her expert's testimony and in granting in part the Chrysler Defendants' motions for summary judgment. We disagree and affirm.

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. A defendant who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's case; instead, the burden on

---

[1] Chrysler Motors and Chrysler Financial will be referred to collectively as the "Chrysler Defendants."

the moving party may be discharged by pointing out by reference to the affidavits, depositions and other documents in the record that there is an absence of evidence to support the nonmoving party's case. If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue. Our review of the grant [or denial] of summary judgment is de novo, and we construe the evidence and all inferences therefrom in favor of the nonmoving party.

(Citations omitted.) *Henson v. Ga.-Pacific Corp.*, 289 Ga. App. 777, 777-778 (658 SE2d 391) (2008). See also *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). Mindful of these principles, we turn to the record in the present case.

*Metro's Relationship with Chrysler Motors.* Chrysler Motors distributes Chrysler, Jeep, and Dodge vehicles to a nationwide network of authorized dealers, which then sell those vehicles to the general public at retail. From September 2001 until April 2005, Metro was a dealer authorized by Chrysler Motors to sell and service Dodge vehicles in Snellville pursuant to a franchise agreement commonly referred to as a "Dealer Agreement." The Dealer Agreement set forth a number of standards that had to be met by Metro to retain the franchise and delineated several situations in which Chrysler Motors could terminate the franchise, whether with or without notice or an opportunity to cure. In addition to sales and service standards, the Dealer Agreement described a number of financial standards that Metro was required to meet.

Chrysler Motors also created a "Five Star Certification Program" for its dealers. Chrysler Motors dealers qualified for the program if they met certain criteria aimed at increasing customer satisfaction. In order to qualify, a dealer was required to, among other things, have processes and procedures in place for customer follow-up, trained sales and service staff, and a facility with ample parking and convenient waiting areas. Qualification, however, was not dependent on a dealer meeting any capitalization or other financial requirements. If a dealer met the criteria of the Five Star Certification Program, the dealer was entitled to display the Five Star logo and advertise itself as a Five Star dealership. A dealer's certification under the program was reevaluated on an annual basis. Metro was certified as a Five Star dealer by Chrysler Motors in April 2003, and its certification was renewed the following year.

During the course of its operation, Metro submitted monthly financial statements to Chrysler Motors. Sales and service representatives from Chrysler Motors also regularly visited Metro.

*Metro's Relationship with Chrysler Financial.* Metro acquired its new vehicle inventory from Chrysler Motors by ordering vehicles and paying for them prior to delivery. In contrast to the used vehicles sold at the dealership, Metro financed its new vehicle inventory through an open line of credit commonly referred to as a "floor plan." Most of the vehicles at Metro were financed under the floor plan. Metro obtained its floor plan financing from Chrysler Financial, the terms of which were memorialized in a "Master Loan and Security Agreement" (the "Loan Agreement"). Under the floor plan, Metro would order new vehicles from Chrysler Motors; Metro would pay for the vehicles through its credit line with Chrysler Financial, creating a wholesale loan between Metro and Chrysler Financial; and Chrysler Motors would ship the vehicles to Metro. Metro then was obligated to repay the wholesale loan on a floor planned vehicle to Chrysler Financial once the vehicle was sold at retail. The Loan Agreement stated that in return for providing financing, Chrysler Financial would be granted a security interest in the "collateral," which was defined broadly to include all of Metro's new and used vehicle inventory, all dealership equipment, and accounts receivable and other intangible contract rights of the dealership. The Loan Agreement further provided that Metro would be in default if, among other things, Metro failed to meet certain minimum capitalization requirements. In the event of default, the Loan Agreement authorized Chrysler Financial to appoint a "keeper" to enter and remain on Metro's premises and take various actions to protect Chrysler Financial's collateral.

*Metro's Financial Difficulties.* Around October 2003, Chrysler Financial audited Metro and discovered that the dealership was undercapitalized by approximately $1,800,000. As a result of the audit, Chrysler Financial placed Metro on a "finance hold," meaning that Chrysler Financial temporarily ceased providing Metro with an open line of credit for the purchase of new vehicle inventory. In an effort to regain financial stability and reestablish its floor plan, Metro informed Chrysler Motors of its financial difficulties and requested a loan to assist with its capitalization problem, a request that ultimately was denied. Metro also requested a loan from Chrysler Financial, but that request also was denied.

*Appointment of the Keeper.* Due to the audit results, Chrysler Financial entered into a "Recapitalization Agreement" with Metro under which Chrysler Financial agreed to forbear from demanding immediate payment in full of all of its outstanding loans in return for Metro meeting certain capitalization conditions over a period of months. Additionally, the Recapitalization Agreement entitled Chrysler Financial to place a keeper on site at Metro to ensure that

payoff of the outstanding wholesale loans on floor planned vehicles occurred "immediately upon consummation of the sale" of a vehicle.

The keeper placed at Metro began performing a vehicle inventory and conducting a financial review of the dealership on a daily basis. Each day, the keeper would share the information he gathered from his financial reviews with management personnel at Chrysler Financial. The financial reviews revealed that Metro was in dire financial condition and as a result was falling behind on its tax obligations, was having trouble paying its debts owed to various creditors, and was failing to promptly pay off the liens on used vehicles that had been traded in by customers as part of their purchase transactions with Metro.

Due to the financial condition of the dealership and concern that its collateral might be in jeopardy, Chrysler Financial instructed the keeper, pursuant to the Loan and Recapitalization Agreements, to take possession of the certifications of origin[2] and titles of Metro's vehicle inventory. As a result, the keeper could veto the sale of a vehicle if the financial structure of the deal was insufficient to cover any money owed to Chrysler Financial.

The keeper also had Metro set up a special banking account, referred to as the "proceeds account," based on the broad authority granted him under the Loan and Recapitalization Agreements. Upon Metro's sale of any vehicle, the purchase monies were deposited into the proceeds account. The keeper then used the deposited funds to satisfy the wholesale loans owed to Chrysler Financial on floor planned vehicles that had been sold. After paying off the wholesale loans, any remaining funds were transferred out of the proceeds account into Metro's operating account. This process occurred on a daily basis. Once funds were deposited into Metro's operating account, Metro decided how to use those funds to meet its other financial obligations.

In April 2004, Chrysler Financial permanently terminated all credit lines with Metro because Metro had failed to meet the capitalization conditions set forth in the Recapitalization Agreement. The keeper remained on site at Metro until December 2004 in an effort to recover funds to satisfy the wholesale loans on the floor planned vehicles that still remained for sale at the dealership.

*Clemente's Purchase Transaction at Metro.* In July 2004, Clemente decided to purchase a new vehicle. While conducting research on a possible purchase, Clemente learned that Metro was a Five Star

---

[2] When a new vehicle is shipped to a dealer, the vehicle is accompanied by a certificate of origin from the manufacturer, which is then converted into a title document when the vehicle is sold at retail.

dealership. The sign outside Metro also had the Five Star logo on it. Due in part to the Five Star certification, Clemente decided to go to Metro, where she purchased a 2004 Dodge Durango. As part of the purchase transaction, Clemente traded in her used 2003 Ford F-150, which was subject to an outstanding lien in favor of a third party creditor. Metro represented to Clemente that the Durango was new and agreed that Metro would apply the funds from her purchase of the Durango toward paying off the outstanding balance on her loan on the Ford F-150.

During her purchase at Metro, Clemente never spoke with or had any interaction with the keeper. It is undisputed that the Durango was not a floor planned vehicle because it was in fact a used vehicle; thus, the Durango was not subject to an outstanding wholesale loan that was owed to Chrysler Financial. Furthermore, business records from Metro reflect that the funds for the purchase of the Durango were paid into the proceeds account but then were transferred in full to Metro within one day.

Clemente later learned that the Durango had been previously owned and had been returned to the dealership by the prior owner. She also received notification from her creditor that Metro had not paid off the loan on her Ford F-150. To protect her credit rating, Clemente continued to make payments on the Ford F-150 loan in addition to the loan payments she was making to the bank that had financed her purchase of the Durango.

*Metro's Closing.* In February 2005, the State of Georgia seized Metro due to its failure to pay taxes, forcing it to cease operation. Chrysler Motors revoked Metro Dodge's Five Star certification that same month. Chrysler Motors terminated its Dealer Agreement with Metro in April 2005.

*The Settlement.* In May 2005, Clemente recovered her damaged Ford F-150 from the Metro lot and received a refund check from the Governor's Office of Consumer Affairs for the State of Georgia ("OCA") in an amount equal to all the payments she had made on the F-150 between the time she traded it in until the time she regained possession. The monies used for this refund came from Metro pursuant to a settlement agreement it had reached with the OCA. In turn, Metro received the funds to pay the OCA from a separate settlement that Metro had reached with the Chrysler Defendants. Additionally, in return for surrendering the Durango to the bank which had financed her purchase of that vehicle, the bank reimbursed Clemente for all of the payments she had made on the Durango.

*The Litigation.* Clemente filed a complaint against Metro Dodge and several of its officers and employees alleging that they were liable for misrepresenting the condition of the vehicle she purchased

and failing to pay off the loan on her trade-in vehicle. She asserted claims against them for, among other things, breach of contract, fraud, theft by deception, conversion, deceptive trade practices, invasion of privacy, and violations of the Georgia Racketeer Influenced and Corrupt Organizations Act ("RICO"), OCGA § 16-14-1 et seq.

Clemente later joined Chrysler Motors and Chrysler Financial as defendants. She alleged that they were vicariously liable for Metro's misconduct and were directly liable for negligence, fraud, negligent misrepresentation, tortious interference with contract, conversion, punitive damages, and attorney fees. Clemente further alleged that the Chrysler Defendants could be held vicariously liable for each other's acts and omissions.

The Chrysler Defendants moved for summary judgment on all of Metro's vicarious and direct liability claims, which the trial court initially denied. The trial court subsequently found that Clemente's disclosure of her expert witness after the close of discovery had been untimely and that the expert still had not been fully deposed although the scheduled trial was one week away. As a result, the trial court amended its order to exclude the expert's testimony, but held that summary judgment still should be denied. Later, on motion for reconsideration, the trial court amended its order to grant summary judgment to the Chrysler Defendants on the conversion claim. The trial court also granted summary judgment in favor of Chrysler Financial on the issue of whether it could be held vicariously liable for the acts and omissions of Chrysler Motors under an "alter ego"/ piercing the corporate veil theory. In turn, the trial court also granted summary judgment in favor of Chrysler Motors on the issues of whether Clemente could recover for emotional distress and whether she could hold Chrysler Motors vicariously liable for Metro's alleged civil RICO violations and certain predicate acts thereunder. The trial court denied the motion for reconsideration as to all the other claims of vicarious and direct liability.

The trial court certified its amended summary judgment order for immediate review, and this Court granted the Chrysler Defendants' applications for interlocutory appeal in Case Nos. A08A0870 and A08A0871. Clemente then filed a cross-appeal in Case No. A08A0872 challenging the partial grant of summary judgment to the Chrysler Defendants and the exclusion of her expert's testimony.

### Case No. A08A0870

In Case No. A08A0870, Chrysler Motors contends that the trial court erred in denying summary judgment in its favor on Clemente's vicarious liability claims and on her direct liability claims of negli-

gence, fraud, negligent misrepresentation, tortious interference with contract, and damages. For the reasons discussed below, we agree.

1. *Vicarious Liability*. The trial court ruled that there was a genuine issue of material fact over whether Chrysler Motors could be held vicariously liable for the acts and omissions of Metro and Chrysler Financial. In her summary judgment pleadings, Clemente asserted that Chrysler Motors' relationship with Metro went beyond that of a franchise relationship and that it could be held vicariously liable because Metro was acting as its agent and Chrysler Motors ratified Metro's conduct.[3] She argued that Chrysler Motors could be held liable for Chrysler Financial's acts and omissions under a joint venture/common enterprise theory.

(a) *Agency*. In order to prove her claim that Metro was Chrysler Motors' agent, Clemente must show that Chrysler Motors controlled the time, manner, and method of Metro's day-to-day operations. *BP Exploration & Oil v. Jones*, 252 Ga. App. 824, 825 (1) (a) (558 SE2d 398) (2001). See also *Pizza K v. Santagata*, 249 Ga. App. 36, 38 (547 SE2d 405) (2001) (agency relationship requires that alleged principal "exercise supervisory control over the daily activities of . . . employees").

> In applying this test, we must be mindful of the special relationship created by a franchise agreement, for a franchisor is faced with the problem of exercising sufficient control over a franchisee to protect the franchisor's national identity and professional reputation, while at the same time foregoing such a degree of control that would make it vicariously liable for the acts of the franchisee and its employees.

---

[3] Clemente also argued that Chrysler Motors could be held liable as a joint tortfeasor solely based on proof that "its acts of commission and omission contributed to the conditions which caused the harm." This argument is without merit. The rule as stated by Clemente is incomplete because a causal connection between a defendant's actions and the plaintiff's injury is not enough; there must be a showing that the defendant committed the other elements of a tort. It is only when "the separate and independent acts *of negligence* of two or more persons or corporations combine naturally and directly to produce a single indivisible injury other than a nuisance . . . [that] the actors are joint tortfeasors, jointly and severally liable for the full amount of plaintiff's damages." (Citation and punctuation omitted; emphasis supplied.) *Mitchell v. Gilson*, 233 Ga. 453, 454 (211 SE2d 744) (1975). See also *State Line Metals v. Aluminum Co. of America*, 216 Ga. App. 14, 18 (2) (453 SE2d 474) (1994) (the fact that the harm suffered by the plaintiff was "single and indivisible" was insufficient to make the defendant a joint tortfeasor, where there was no evidence that the defendant negligently breached its duty); *Dept. of Transp. v. Smith*, 210 Ga. App. 741, 743 (2) (437 SE2d 811) (1993) (defendant could not be deemed a joint tortfeasor where there was no evidence that the defendant owed a duty to the plaintiff). As explained infra in Division 2, Clemente has failed to come forward with evidence to support a negligence claim against Chrysler Motors as a matter of law.

(Citations and punctuation omitted.) Id. at 37. Given this special relationship, we have held that "a franchisor may protect its franchise and its trade name by setting standards governing its franchisee's operations," and "these standards may be quite detailed, specific, and strict." *Schlotzsky's, Inc. v. Hyde*, 245 Ga. App. 888, 890 (538 SE2d 561) (2000). Moreover, the fact that a franchise agreement authorizes periodic inspections of the franchise and gives the franchisor the right to terminate the agreement for noncompliance is not enough to prove an agency relationship. See *Pizza K*, 249 Ga. App. at 38-39.

While the Dealer Agreement between Chrysler Motors and Metro set out standards that had to be met by Metro to retain the franchise and specified particular situations in which Chrysler Motors could terminate the franchise for Metro's noncompliance, the Agreement does not contain any provisions giving Chrysler Motors supervisory control over the day-to-day activities of Metro. Furthermore, the Dealer Agreement expressly stated that neither party was the agent of the other. And the uncontroverted affidavits and deposition testimony establish that Metro set its own hours of operation and its own retail prices, and that Chrysler Motors had no authority to hire, fire, or evaluate Metro's employees, had no control over which creditors Metro chose to pay or how Metro spent its funds, had no authority over vehicle financing, and was not involved in the trading in of used vehicles. Finally, the evidence established without contradiction that Chrysler Motors had no role in the sale of the Durango to Clemente, her subsequent financing, the trading in of her Ford F-150, or the responsibility to pay off the loan on her trade-in vehicle. Under these circumstances, Clemente has failed to come forward with evidence that Chrysler Motors controlled the time, manner, and method of Metro's daily operations. See *BP Exploration & Oil*, 252 Ga. App. at 825-826 (1) (a) (franchised service station was not agent of oil company franchisor); *Wells v. Vi-Mac, Inc.*, 226 Ga. App. 261, 261-262 (1) (486 SE2d 400) (1997) (service station was not agent of gasoline supplier).

Alternatively, a franchisor can be held liable for the acts and omissions of its franchisee if the franchisor "has by some act or conduct obligated itself to pay the debts of the franchisee." *Schlotzsky's, Inc.*, 245 Ga. App. at 888-889. In opposition to summary judgment, Clemente argued that Chrysler Motors obligated itself to pay the debts of Metro based on the settlement agreement reached between Chrysler Motors and Metro.

The record reflects that after Chrysler Motors terminated Metro's Dealership Agreement, several disputes arose between Chrysler Motors and Metro, including whether the termination of the franchise was proper and whether the owner of Metro should

have been authorized to sell the business assets to a third party purchaser. Metro ultimately brought an administrative action against Chrysler Motors for wrongful termination of the franchise, and the parties, along with Chrysler Financial and another entity, entered into a "Settlement Agreement and Mutual Release." Under the terms of the settlement, Chrysler Motors agreed to pay $2,500,000 to Metro in return for a full release of liability. The agreement further specified that the settlement funds would first be used to settle claims brought against Metro and its sole shareholder by the OCA, the Georgia Department of Revenue, and the Georgia Department of Labor, with the residual funds going directly to Metro and its shareholder.

Contrary to Clemente's assertion, Chrysler Motors did not obligate itself to pay the debts of Metro by entering into the settlement agreement with Metro. The agreement does not contain any language under which Chrysler Motors agreed to indemnify Metro or otherwise assume Metro's outstanding debts. Nor does Clemente claim that she is a third party beneficiary of the settlement or that Chrysler Motors ever made any representations to consumers that it would assume the debts that Metro owed to them. Thus, the settlement agreement cannot be construed as an agreement by Chrysler Motors to assume liability for all of Metro's obligations. See *Whitco Produce Co. v. Bonanza Intl.*, 154 Ga. App. 92, 93 (267 SE2d 627) (1980).

For these reasons, the trial court erred in concluding that Chrysler Motors could be held vicariously liable for the acts and omissions of Metro based on a principal-agent relationship. The trial court should have granted summary judgment to Chrysler Motors on this theory of vicarious liability.

(b) *Ratification.* "For ratification to occur, the principal must accept and retain the benefits of the unauthorized act." *Reynolds v. L&L Mgmt.*, 228 Ga. App. 611, 614 (2) (a) (492 SE2d 347) (1997). There is no evidence that Chrysler Motors ever accepted and retained the benefits of Metro's alleged wrongdoing. Chrysler Motors was paid in full for vehicles when it initially shipped the vehicles to Metro and, therefore, did not receive any benefit at the time the vehicles were later sold at retail. Furthermore, the undisputed evidence shows that Chrysler Motors had no involvement and received no benefit from the trading in of vehicles or from the paying off of loans on those vehicles. As such, no evidentiary basis exists for concluding that Chrysler Motors ratified the acts of Metro, and the trial court erred in denying Chrysler Motors' summary judgment on Clemente's ratification claim.

(c) *Joint Venture/Common Enterprise.* The trial court concluded that there was a genuine issue of material fact over whether Chrysler

Motors could be held vicariously liable for Chrysler Financial's conduct under a joint venture common enterprise theory. As explained infra in Case No. A08A0871, Clemente has failed to present evidence establishing any direct liability against Chrysler Financial. Where the liability of a defendant is predicated on his vicarious liability for the acts and omissions of another party and judgment is entered in favor of that party, the defendant also is entitled to judgment on the vicarious liability claim. *ITT Rayonier v. McLaney*, 204 Ga. App. 762, 764 (1) (420 SE2d 610) (1992). The trial court thus should have granted summary judgment to Chrysler Motors on this claim.

2. *Negligence.* "The threshold issue in any cause of action for negligence is whether, and to what extent, the defendant owes the plaintiff a duty of care. Whether a duty exists upon which liability can be based is a question of law." *Holcomb v. Walden*, 270 Ga. App. 730, 731 (607 SE2d 893) (2004). The trial court ruled that Chrysler Motors had a legal duty enforceable under OCGA §§ 51-1-6[4] and 51-1-8[5] to prevent Metro from presenting an unreasonable risk of harm to the public based on the Georgia Motor Vehicle Franchise Practices Act, OCGA § 10-1-620 et seq. (the "Franchise Practices Act"), and the Dealer Agreement. The trial court further determined that there was a genuine issue of material fact over whether this duty had been breached.

(a) *The Franchise Practices Act.* A legal duty sufficient to support liability in negligence can be predicated on a duty imposed by a valid statutory enactment of the legislature. *Murray v. Ga. Dept. of Transp.*, 284 Ga. App. 263, 272 (4) (644 SE2d 290) (2007). See OCGA §§ 51-1-6; 51-1-8. The Franchise Practices Act, however, does not impose a legal duty upon automobile franchisors toward *consumers*. See *Toirkens v. Willett Toyota*, 192 Ga. App. 109, 110 (1), n. 1 (384 SE2d 218) (1989) (noting that the Franchise Practices Act "applies to transactions between automobile manufacturers and their franchisees").

As its provisions make clear (OCGA §§ 10-1-620 to 10-1-670), the purpose of the Franchise Practices Act is to regulate the relationship between automobile franchisors and their franchise dealers in the State of Georgia. See *Toirkens*, 192 Ga. App. at 110 (1),

---

[4] OCGA § 51-1-6 provides: "When the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another, although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby."

[5] OCGA § 51-1-8 provides: "Private duties may arise from statute or from relations created by contract, express or implied. The violation of a private duty, accompanied by damage, shall give a right of action."

n. 1. Among other things, it provides that a franchisor must act in good faith in its relationship with its franchisee (OCGA §§ 10-1-631 (a) (1); 10-1-662 (a) (7)); sets forth the circumstances and procedural requirements under which a franchisor may terminate the franchise agreement with the franchisee dealer (OCGA § 10-1-651); and places restrictions on the franchisor's ability to establish a new dealership near an existing one (OCGA § 10-1-664 (a)).[6] Given its statutory structure, it is clear that the Act does not create any duties running to an automobile consumer from a franchisor either explicitly or implicitly.

In arguing that the Franchise Practices Act creates a duty toward consumers, Clemente relies upon the legislative findings codified as part of the Act, which provide in part: "The maintenance of strong and sound dealerships is essential to provide continuing and necessary reliable services to the consuming public in this state and to provide stable employment to the citizens of this state." OCGA § 10-1-621 (4). This statutory provision, however, simply explains one of the reasons why the General Assembly created the Franchise Practices Act; it does not place an affirmative duty upon franchisors to ensure that their franchisees are "strong and sound." Indeed, read in context of other provisions such as OCGA §§ 10-1-631 (a) (1) and 10-1-662 (a), the legislative findings reflect the General Assembly's intent that the Act protect dealerships from being treated improperly by automobile franchisors so that dealerships can continue to provide services to the public.

Because the Franchise Practices Act does not impose upon Chrysler Motors a legal duty to prevent Metro from presenting an unreasonable risk of harm to members of the public like Clemente, the trial court erred in denying Chrysler Motors' motion for summary judgment on Clemente's negligence claim predicated on the Act.

(b) *The Dealer Agreement.* Relying upon *Underberg v. Southern Alarm,* 284 Ga. App. 108, 111 (1) (643 SE2d 374) (2007), the trial court held that the Dealer Agreement imposed a legal duty upon Chrysler Motors on behalf of consumers to police Metro's business practices and terminate the Dealer Agreement upon learning of Metro's default of its provisions.

It is true that the Dealer Agreement between Chrysler Motors and Metro delineates certain standards that have to be met by Metro

---

[6] While the Franchise Practices Act contains provisions creating a private right of action for specific statutory violations (OCGA § 10-1-623), Clemente has asserted her cause of action under OCGA §§ 51-1-6 and 51-1-8 and argues more expansively that the Act imposes a duty upon automobile franchisors to protect the consuming public from harm caused by franchise dealers.

to retain the franchise, but nowhere does the Agreement place an affirmative duty upon Chrysler Motors to monitor Metro to ensure compliance with these standards. Furthermore, while the Dealer Agreement sets forth particular situations in which Chrysler Motors can terminate the franchise for Metro's noncompliance with or without notice, the termination provisions of the Agreement are in large part intended for the protection and benefit *of Chrysler Motors* so that it can quickly end the franchise relationship without fear of liability if problems with the dealership arise. To the extent the termination provisions place any affirmative duty on Chrysler Motors, it is simply to comply with certain procedural notice requirements prior to termination. In other words, the Dealer Agreement authorizes and empowers Chrysler Motors to terminate the franchise under particular circumstances; it does not impose an affirmative, nondiscretionary obligation upon Chrysler Motors to terminate, the breach of which can serve as the basis for liability. Consequently, the Dealer Agreement poses no affirmative duty upon Chrysler Motors to police Metro's business practices and terminate the Agreement upon learning of Metro's default. Cf. *Waller v. Economic & Community Dev. Dept.*, 269 Ga. App. 129, 131 (1) (603 SE2d 442) (2004) (noting that homeowner normally cannot sue lender for negligent construction "because the lender's customary participation, the inspection, is normally not made for the benefit of the homeowner, but is made instead for the protection and benefit of the lender"). In any event, even if the Dealer Agreement imposed a duty upon Chrysler Motors to police Metro and terminate the Agreement, that alone still would be insufficient to support Clemente's negligence claim.

> [A] defendant's mere negligent performance of a contractual duty does not create a tort cause of action; rather, a defendant's breach of a contract may give rise to a tort cause of action only if the defendant has also breached an independent duty created by statute or common law.

(Citation omitted.) *Fielbon Dev. Co. v. Colony Bank of Houston County*, 290 Ga. App. 847, 855 (3) (660 SE2d 801) (2008).[7] Clemente has pointed to no such independent duty in this case. In concluding

---

[7] A third-party beneficiary can bring a claim for breach of contract, but the "third-party beneficiary must be the intended beneficiary of the contract. The mere fact that a third party would benefit incidentally from the performance of the contract is not alone sufficient to give such person standing to sue on the contract." *Hubbard v. Dept. of Transp.*, 256 Ga. App. 342, 352 (4) (568 SE2d 559) (2002). Clemente was not a party to the Dealer Agreement, and she does not contend that she was a third party beneficiary or assert a claim for breach of contract against Chrysler Motors.

otherwise, the trial court relied upon *Underberg*, 284 Ga. App. at 110-111 (1). Notably, however, *Underberg* involved not only the defendant employer's breach of a contractual duty, but also the employer's breach of the independent, common law duty it had to exercise ordinary care not to hire or retain an employee whom the employer knew or should have known posed a risk of harm to others. Id. at 110 (1). That independent duty is not at issue here, and so *Underberg* is inapposite.

The trial court thus erred in concluding that the Dealer Agreement imposed an affirmative duty upon Chrysler Motors on behalf of consumers that could serve as the basis for Clemente's negligence claim. Summary judgment should have been granted to Chrysler Motors on this claim.

3. *Fraud and Negligent Misrepresentation.* "In order to prove fraud, the plaintiff must establish five elements: [1] a false representation by a defendant, [2] scienter, [3] intention to induce the plaintiff to act or refrain from acting, [4] justifiable reliance by plaintiff, and [5] damage to plaintiff." *Alexander v. A. Atlanta Autosave*, 272 Ga. App. 73, 75 (1) (611 SE2d 754) (2005). In turn, "[t]he essential elements of negligent misrepresentation are: (1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance." (Citation and punctuation omitted.) *Smiley v. S&J Investments*, 260 Ga. App. 493, 498 (2) (580 SE2d 283) (2003). In denying summary judgment to Chrysler Motors on Clemente's fraud and negligent misrepresentation claims, the trial court held that the Five Star certification that Metro was permitted to display was a representation by Chrysler Motors upon which these tort claims could be predicated. The trial court concluded that "continuing to advertise Metro as a Five Star dealer long after it had notice of [Metro's] various defaults [of the Dealer Agreement] could be deemed fraudulent or negligent misrepresentation."

Clemente concedes on appeal that the representation that a dealer was Five Star did not convey any representations about the creditworthiness, financial condition, or solvency of the dealership. Furthermore, there is no evidence that the Five Star certification was meant as a guarantee that a franchise dealer had complied with all of the dealer's various contractual obligations owed to Chrysler Motors.

Internal Chrysler Motors' business records reflect that in order to qualify for the Five Star Certification Program, a dealer was required to meet several specific requirements in the following categories: "Facility," "Training," "Employee," "Sales Process," "Service Process," "Parts Process," and "Follow-Up Process." But

Clemente does not rely upon or discuss these specific requirements or present argument or evidence as to how any particular requirement was violated by Metro. Rather, her contention is more generally that the display of the Five Star logo at the dealership and the reference in Metro's advertising to its Five Star certification represented to the public that Metro offered "superior products and service to the public" and provided "superior performance," and that she was entitled to rely on these representations.

These types of generalized representations cannot serve as the basis for a fraud or negligent misrepresentation claim. Where, as here, the alleged "representation consists of general commendations or mere expressions of opinion, hope, expectation and the like," the claim must fail. (Footnote omitted.) *Anderson v. Atlanta Committee for the Olympic Games*, 261 Ga. App. 895, 900 (2) (584 SE2d 16) (2003) (holding that representation "that Atlanta would be the safest place on earth during the [Olympic] Games were mere expressions of opinion, hope, and expectation").[8] Such statements are not "definite" and thus are not "capable of exact proof." *King v. Codisco*, 217 Ga. App. 704, 705 (1) (458 SE2d 881) (1995).

By certifying Metro as a Five Star dealership, Chrysler Motors was not guaranteeing or ensuring that a customer would be fully satisfied with Metro or that Metro would fulfill all of its own contractual duties owed to the customer. Yet, such a guarantee would be the practical result if we were to hold that representations that Metro offered "superior products and service to the public" and provided "superior performance" were actionable. Accordingly, the trial court erred in concluding that the Five Star certification displayed by Metro could support Clemente's fraud or negligent misrepresentation claim, and summary judgment in favor of Chrysler Motors should have been granted on these claims.

4. *Tortious Interference with Contract.* To succeed on a claim of tortious interference with contract, the plaintiff must prove that the defendant: "(1) acted improperly or wrongfully and without privilege; (2) acted purposely, with malice, and with the intent to injure; (3) induced a third party to breach a contract with the plaintiff; and

---

[8] See also *ReMax North Atlanta v. Clark*, 244 Ga. App. 890, 892-894 (537 SE2d 138) (2000) (representations by real estate agent that home was "in good condition" and "a good buy," and that seller was "honest," were general commendations that could not serve as the basis for a fraud claim); *U-Haul Co. of Western Ga. v. Dillard Paper Co.*, 169 Ga. App. 280, 281 (312 SE2d 618) (1983) (representations "that the building was of 'excellent construction and had been well maintained,' that it was 'one of the best warehouse buildings in the City of Atlanta,' and that the building was sound" were not actionable as fraud); *Charter Med. Mgmt. Co. v. Ware Manor*, 159 Ga. App. 378, 383 (5) (283 SE2d 330) (1981) (representation that defendant had "expertise and experience in profitably operating nursing homes" was a general commendation that could not serve as the predicate for a fraud claim).

(4) caused plaintiff financial injury." *Medlin v. Morganstern*, 268 Ga. App. 116, 119 (a) (601 SE2d 359) (2004). Clemente argued, and the trial court agreed, that by failing to police and terminate Metro's franchise under the Dealer Agreement once Metro was in default, Chrysler Motors tortiously interfered with the contracts of Metro's customers like Clemente. As explained supra in Division 2 (b), Chrysler Motors did not owe an affirmative legal duty to Metro's customers to police and terminate Metro's franchise pursuant to the Dealer Agreement. The trial court therefore erred in failing to grant summary judgment to Chrysler Motors on the tortious interference claim.

5. *Damages*. Clemente cannot prevail on her claims for punitive damages and attorney fees, given that those claims could succeed only if she succeeded on her underlying tort claims, which fail as a matter of law as explained supra in Divisions 1-4 and infra in Division 13. See *Walker County v. Tri-State Crematory*, 284 Ga. App. 34, 40 (1) (643 SE2d 324) (2007). Chrysler Motors is entitled to summary judgment on Clemente's claims for punitive damages and attorney fees.[9]

## Case No. A08A0871

In Case No. A08A0871, Chrysler Financial argues that the trial court should have granted summary judgment in its favor on Clemente's vicarious liability claims and on her direct liability claims of negligence, fraud, negligent misrepresentation, tortious interference with contract, and damages. For the reasons set forth below, we agree.

6. *Vicarious Liability*. The trial court ruled that there was a genuine issue of material fact over whether Chrysler Financial could be held vicariously liable for the acts and omissions of Metro and Chrysler Motors. In her summary judgment pleadings, Clemente asserted that the keeper placed at Metro by Chrysler Financial had "effective control over the financial operations of the dealership" and "controlled the purse-strings" there to such an extent that Chrysler Financial could be held vicariously liable for Metro's conduct under theories of agency and ratification.[10] She also argued that Chrysler Financial could be held liable for Chrysler Motors' acts and omissions under a joint venture/common enterprise theory.

[9] Chrysler Motors also enumerates as error the trial court's ruling on how damages should be calculated. We need not reach this enumeration given our conclusion that Clemente's substantive claims against Chrysler Motors cannot succeed.

[10] Clemente further asserted that Chrysler Financial can be held liable as a joint tortfeasor solely based on proof that it contributed to the conditions which caused the harm. Her argument lacks merit for the reasons discussed supra in footnote 3.

(a) *Agency.* As previously noted, an agency relationship exists only if the purported principal retains the right to control the time, manner, and method of the purported agent's work, thereby exercising supervisory control over the daily activities of the purported agent. *BP Exploration & Oil*, 252 Ga. App. at 825 (1) (a); *Pizza K*, 249 Ga. App. at 38. The general rule is that the relationship between a secured creditor and debtor, standing alone, does not create an agency relationship. See generally *First Nat. Bank of Gainesville v. Alvin Worley & Sons, Inc.*, 221 Ga. App. 820, 820-821 (2) (472 SE2d 568) (1996). Moreover, even if an agency relationship is found to exist, a principal cannot be held liable for the acts of its agent taken outside the scope of the agency, unless the principal ratifies such acts. *Burnett v. Lewis*, 40 Ga. App. 525, 528 (150 SE 462) (1929). See also OCGA § 51-2-2; *Stewart v. Storch*, 274 Ga. App. 242, 245 (1) (617 SE2d 218) (2005); *Hardware Mut. Cas. Co. v. Collier*, 69 Ga. App. 235, 244 (5) (25 SE2d 136) (1943).

Even if a partial agency relationship existed between Chrysler Financial and Metro due to the role of the keeper, the acts of Metro forming the basis for Clemente's claims fall outside the scope of that agency. Clemente alleges that Metro's personnel misrepresented to her the condition of the vehicle she purchased. But, as Clemente herself states, her argument is that the keeper "had effective control over the *financial* operations of the dealership." The uncontroverted testimony of record is that the keeper had no role in or control over the hiring, training, evaluating, or firing of Metro's employees and no supervisory control over those employees' interactions with customers. Thus, any misrepresentations by Metro's employees concerning the condition of the purchased vehicle were outside the scope of any agency relationship between Chrysler Financial and Metro as a matter of law.

While Clemente also alleges that Metro failed to pay off the loan on her trade-in vehicle, there is no evidence that the keeper had authority or control over Metro's disbursements to third party creditors of Metro, including those creditors who held liens on trade-in vehicles. The Recapitalization Agreement contractually obligated Metro, not Chrysler Financial, to "pay any and all liens on 'trade-in vehicles' . . . immediately upon receipt of possession of a 'trade-in vehicle.'" Likewise, the Loan Agreement put the burden solely on Metro to "[p]ay promptly when due all contractual obligations calling for the payment of money, and all claims, assessments and charges which constitute, or, if unpaid, may became a lien, charge or encumbrance upon [Metro's] business or any of [Metro's] properties or assets." As such, the loan documents between Chrysler Financial and Metro specifically placed the responsibility to pay off the loans on trade-in vehicles on Metro and did not give Chrysler

Financial or its keeper control or supervisory authority over those payments.

The deposition testimony points to the same conclusion. The deposition testimony reflects that Metro used the funds from its operating account to make payments to third party creditors, including those that held liens on trade-in vehicles. And the uncontroverted testimony of record is that the keeper had no authority or control over funds in the operating account; was not empowered to direct Metro to pay certain creditors out of those funds; and had no authority or control over how Metro chose to prioritize its payments to third party creditors, including any creditor who held an existing lien on a customer's trade-in vehicle. Rather, the uncontroverted testimony establishes that the decision over which of Metro's third party creditors to pay first, and the responsibility of ensuring trade-in liens and other debts were properly satisfied, rested solely with Metro's managerial staff, not the keeper.[11] Consequently, responsibility and control over the payment of third party creditors, including lien holders, was outside the scope of any agency relationship existing between Chrysler Financial and Metro. See *Peterson v. First Clayton Bank & Trust Co.*, 214 Ga. App. 94, 99-100 (1) (b) (447 SE2d 63) (1994) (even if agency relationship existed between lender bank and homeowner concerning the making of payments to the builder, the bank nevertheless had no responsibility to ensure that other creditors involved in the building project got paid).

In light of this uncontradicted evidence, the trial court committed error in denying summary judgment on this claim and concluding that Chrysler Financial could be held vicariously liable for Metro's acts and omissions under an agency theory.

(b) *Ratification.* There is likewise no evidence that Chrysler Financial, through its keeper, ratified the alleged misrepresentations made to Clemente concerning the condition of her new vehicle or Metro's failure to pay off the loan on her trade-in vehicle. As noted, before a party can be held vicariously liable under the theory of

---

[11] Clemente contends that there is a conflict in the deposition testimony over whether the keeper exercised authority and control over the disbursement of Metro's funds to other creditors. To support her contention, she relies upon the testimony of Metro's general manager during his first of two depositions. However, to the extent that there was any ambiguity in the general manager's testimony concerning the authority granted the keeper, that ambiguity was eliminated in his subsequent testimony during the same deposition that the keeper would first take from the sales proceeds the money owed to Chrysler Financial and then would allocate the remaining funds to Metro. The general manager further clarified that the keeper was only interested in ensuring that Chrysler Financial's loans were satisfied out of the sales proceeds and "would not look at the monies that were owed" to other creditors. The general manager also clarified that before Metro's comptroller would write a check to pay off a lien on a trade-in vehicle, she would check Metro's operating account to make sure that there were sufficient funds and did not "have to run the check by the [keeper]."

ratification, the party must accept and retain the benefits of the unauthorized act. *Reynolds*, 228 Ga. App. at 614 (2) (a). Here, there is no evidence that Chrysler Financial accepted and retained the benefit from any unauthorized acts by Metro relating to Clemente's sales transaction. The vehicle purchased by Clemente was not a floor planned vehicle because it was in fact a used vehicle, and so it was not subject to an outstanding wholesale loan owed to Chrysler Financial. Nor did Chrysler Financial provide Clemente with financing for the vehicle she purchased. Metro's business records further reflect that the funds for Clemente's vehicle purchase were initially paid into the proceeds account monitored by the keeper, but were then transferred in full to Metro within one day.

Additionally, there is no evidence that Chrysler Financial affirmatively consented to or approved Metro's alleged misconduct. Likewise, any alleged inaction by Chrysler Financial in the face of Metro's alleged misconduct cannot form the basis for ratification because, as explained infra in Division 7, Chrysler Financial did not have a legal duty on behalf of consumers to police Metro and prevent misconduct committed by its employees.

Given this lack of evidence, Clemente's ratification claim failed as a matter of law, and the trial court erred by not granting summary judgment in favor of Chrysler Financial.

(c) *Joint Venture/Common Enterprise.* The trial court concluded that there was a genuine issue of material fact over whether Chrysler Financial could be held vicariously liable for Chrysler Motors' conduct under a joint venture/common enterprise theory. As explained supra in Case No. A08A0870, Clemente has failed to present evidence establishing any direct liability against Chrysler Motors. The trial court erred in denying summary judgment to Chrysler Financial on this claim. See *ITT Rayonier*, 204 Ga. App. at 764 (1).

7. *Negligence.* The trial court ruled that Chrysler Financial had a legal duty enforceable under OCGA §§ 51-1-6 and 51-1-8 to prevent Metro from presenting an unreasonable risk of harm to the public based on the Franchise Practices Act, and that there was a genuine issue of material fact over whether this duty had been breached. Yet, as explained supra in Division 2 (a), the Franchise Practices Act does not impose a legal duty toward consumers. Moreover, we have held that the Franchise Practices Act directs liability at automobile franchisors, not companies that provide automobile financing. See *Nissan Motor Acceptance Corp. v. Stovall Nissan*, 224 Ga. App. 295, 300 (5) (480 SE2d 322) (1997). The trial court thus should have granted summary judgment to Chrysler Financial on Clemente's negligence claim.

8. *Fraud.* In denying summary judgment to Chrysler Financial, the trial court ruled that Clemente had presented evidence sufficient

to create a genuine issue of material fact as to each element of fraud. The trial court held, and Clemente does not contest, that Chrysler Financial "made no direct representations to [Clemente] regarding the transaction with Metro." Rather, Clemente's direct fraud claim is apparently predicated on her contention that Chrysler Financial concealed the fraudulent misconduct allegedly committed by Metro's employees and failed to take steps to prevent this fraud.

Significantly, "an obligation to disclose must exist before a party may be held liable for fraud based upon the concealment of material facts." (Citation and punctuation omitted.) *Infrasource v. Hahn Yalena Corp.*, 272 Ga. App. 703, 705 (1) (613 SE2d 144) (2005). But Clemente has failed to point to any statute or other basis for imposing an affirmative obligation upon an automobile financing company to disclose to dealership customers alleged wrongdoing committed by the dealership's employees, where, as here, the financing company had no interaction with the customer at the time of the sale. The trial court therefore erred in denying summary judgment to Chrysler Financial on the fraud claim.

9. *Negligent Misrepresentation.* While the trial court held that Chrysler Financial could be held liable for negligent misrepresentation based on the Five Star Certification Program, there is no evidence of record that Chrysler Financial played any role in that program, which was created and implemented by Chrysler Motors. Furthermore, as we held in Division 3, the representations that Clemente asserts were made by the display of the Five Star certification cannot serve as the basis for an actionable claim. Summary judgment should have been granted to Chrysler Financial on Clemente's claim of negligent misrepresentation.

10. *Tortious Interference with Contract.* The trial court denied summary judgment on Clemente's claim of tortious interference with contract based on evidence of Chrysler Financial's "single-minded pursuit of recovering any and all funds it claimed were due to it" through its placement of the keeper at Metro, without regard to whether Metro would be able to satisfy its other debts and contractual obligations with the monies left over after Chrysler Financial had been paid. The loan documents between Chrysler Financial and Metro reflect that Chrysler Financial had a perfected first lien on the loan collateral by various UCC-financing statements, and Clemente does not present any argument or evidence to the contrary. Rather, Clemente has conceded that Chrysler Financial was a secured creditor and that the placement of the keeper at Metro and his utilization of a proceeds account were authorized by the loan documents in pursuing the money owed to it by Metro. As a result, she cannot establish that Chrysler Financial acted improperly and without privilege, an essential element of a tortious interference

claim. *Dalton Diversified v. AmSouth Bank*, 270 Ga. App. 203, 209 (4) (a) (605 SE2d 892) (2004). See also *Russell Corp. v. BancBoston Financial Co.*, 209 Ga. App. 660, 663 (4) (434 SE2d 716) (1993) (summary judgment proper on tortious interference claim where lender exercised its contractual right to refuse the debtor's request for additional borrowing, which resulted in the debtor's inability to pay its third party suppliers). The trial court committed error in denying summary judgment to Chrysler Financial on this claim.

11. *Damages.* Since she cannot succeed on her underlying tort claims, Clemente likewise cannot prevail on her claims for punitive damages and attorney fees against Chrysler Financial. See *Walker County*, 284 Ga. App. at 40 (1). Summary judgment in favor of Chrysler Financial should have been granted on Clemente's claims for punitive damages and attorney fees.

### Case No. A08A0872

In Case No. A08A0872, Clemente contends that the trial court erred in excluding her expert's testimony; granting summary judgment to the Chrysler Defendants on her conversion claim; granting summary judgment to Chrysler Financial on the issue of whether it could be held vicariously liable for the acts and omissions of Chrysler Motors under an "alter ego"/piercing the corporate veil theory; and granting summary judgment to Chrysler Motors on her claim that it could be held vicariously liable for Metro's alleged civil RICO violations. For the following reasons, we affirm.

12. *Exclusion of Expert.* The trial court excluded the testimony of Clemente's expert based on the court's conclusion that Clemente's disclosure of her expert witness after the close of discovery had been untimely and the expert had not been fully deposed one week prior to the scheduled trial. Pretermitting whether the expert's testimony was properly excluded on the ground of untimeliness,[12] we affirm the trial court on the alternative ground raised below by the Chrysler Defendants that the expert's opinions stated legal conclusions that the jury could reach for itself. See *Sumter County v. Pritchett*, 125 Ga. App. 222, 227 (3) (186 SE2d 798) (1971) (trial court's exclusion of evidence will be affirmed if right for any reason).

Clemente's expert rendered the following opinions: the keeper took control of Metro to such an extent that Chrysler Financial assumed all responsibility for the receipt and disbursement of funds or the failure to disburse funds; the keeper breached his fiduciary responsibilities to Metro; the Chrysler Defendants are "inextricably intertwined"; and the Chrysler Defendants "absolutely held the

---

[12] See, e.g., *Hart v. Northside Hosp.*, 291 Ga. App. 208, 209 (1) (661 SE2d 576) (2008).

purse strings" of Metro and thus became responsible for the actions of Metro. In reaching these conclusions, the expert relied on the case pleadings, the contracts between the parties, correspondence of the parties, and Metro's financial statements and other business records.

These opinions by Clemente's expert were nothing more than legal conclusions that "cannot be considered as evidence on motion for summary judgment" and thus were properly excluded. (Citation and punctuation omitted.) *Rayburn v. Ga. Power Co.*, 284 Ga. App. 131, 139 (3) (643 SE2d 385) (2007) (expert's opinion that defendant company "retained control" over contractor's employees was an inadmissible legal conclusion). See also *DeVooght v. Hobbs*, 265 Ga. App. 329, 334 (3) (593 SE2d 868) (2004) (expert opinion that actions of one party were imputable to another was an inadmissible legal conclusion); *Allen v. Columbus Bank & Trust Co.*, 244 Ga. App. 271, 277-278 (2) (534 SE2d 917) (2000) (opinion that letter "may be fraudulent" was an inadmissible legal conclusion). "A party may not bolster [her] case as to the ultimate issue with expert testimony when the jury could reach the same conclusion independently of the opinion of others." (Citation and punctuation omitted.) *Baxter v. Melton*, 218 Ga. App. 731, 732 (463 SE2d 53) (1995).

13. *Conversion.* The trial court ruled that Clemente failed to present sufficient evidence to support her conversion claim against the Chrysler Defendants. Clemente contends that the trial court erred because the Chrysler Defendants can be held liable for conversion pursuant to OCGA § 23-1-14.[13]

OCGA § 23-1-14 provides: "When one of two innocent persons must suffer by the act of a third person, he who put it in the power of the third person to inflict the injury shall bear the loss." While this statutory rule can be applied to claims of conversion, see *Atlanta Classic Cars v. Chih Hung USA Auto Corp.*, 209 Ga. App. 908, 909-910 (1) (439 SE2d 498) (1993), it "has many qualifications and can not be applied except in a limited range of circumstances." *Novall v. Mayor &c. of Monroe*, 177 Ga. 648, 656 (171 SE 136) (1933). Notably, the rule does not apply where no fault or negligence can be imputed to the party sought to be held liable under the statute. Id. See also *Sierra Craft v. T. D. Farrell Constr.*, 282 Ga. App. 377, 382 (2) (638 SE2d 815) (2006). And there can be no fault or negligence where no duty was owed the person injured. See *Southern R. Co. v. Liley*, 75 Ga. App. 489, 493 (43 SE2d 576) (1947). As explained supra in Divisions 2 and 7, the Chrysler Defendants did not owe a legal duty to prevent Metro from presenting an unreasonable risk of harm to

---

[13] Clemente also contends that the Chrysler Defendants can be held vicariously liable for Metro's acts of conversion. That contention fails for the same reasons discussed supra in Divisions 1 (a) and (b) and Divisions 6 (a) and (b).

Metro's customers like Clemente. Accordingly, Clemente could not predicate the liability of the Chrysler Defendants on OCGA § 23-1-14 as a matter of law. The grant of summary judgment in favor of the Chrysler Defendants on the conversion claim therefore was appropriate.

14. *Vicarious Liability.* The trial court granted summary judgment in favor of Chrysler Financial on the issue of whether it could be held vicariously liable for the acts and omissions of Chrysler Motors under an "alter ego"/piercing the corporate veil theory. For the reasons discussed supra in Division 6 (c), we affirm the trial court's grant of summary judgment.

For the same reasons discussed supra in Divisions 1 (a) and (b), we likewise affirm the trial court's grant of summary judgment in favor of Chrysler Motors on Clemente's claim that Chrysler Motors could be held vicariously liable for Metro's alleged civil RICO violations.

In sum, we reverse in Case No. A08A0870 and remand with the instruction that the trial court enter summary judgment in favor of Chrysler Motors; we reverse in Case No. A08A0871 and remand with the instruction that the trial court enter summary judgment in favor of Chrysler Financial; and we affirm in Case No. A08A0872.

*Judgment reversed and case remanded in Case No. A08A0870. Judgment reversed and case remanded in Case No. A08A0871. Judgment affirmed in Case No. A08A0872. Ruffin, P. J., and Andrews, J., concur.*

DECIDED SEPTEMBER 25, 2008 —
RECONSIDERATIONS DENIED OCTOBER 8, 2008 AND OCTOBER 15, 2008.

*Sutherland, Asbill & Brennan, Suzanne H. Bertolett, Carla W. McMillian, Daniel H. Schlueter, Baker, Donelson, Bearman, Caldwell & Berkowitz, L. Clint Crosby*, for DaimlerChrysler Motors Company, LLC.

*Greenberg Traurig, Lisa R. Bugni, Mark G. Trigg, David O. Batista, Hayden Pace*, for DaimlerChrysler Financial Services Americas, LLC.

*White & Johnson, Karen T. White*, for Clemente.