**FOURTH DIVISION
MCFADDEN, P. J.,
WATKINS and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**June 5, 2026**

# In the Court of Appeals of Georgia

A26A0564. MULLALLY v. CU CAPITAL MARKET SOLUTIONS, LLC et al.

PADGETT, Judge.

William T. Mullally appeals from the trial court's denial of his motion for directed verdict, or in the alternative, motion for judgment notwithstanding the verdict ("JNOV"). This is the second appearance of this case before this Court. In *Mullally v. CU Capital Market Solutions, LLC*, 368 Ga. App. 602 (890 SE2d 494) (2023), we affirmed the trial court's judgment finding that certain restrictive covenants in the operating agreement of CU Capital Market Solutions, LLC ("CMS") were valid and enforceable against Mullally. Upon remand to the trial court, a jury found in favor of CMS and against Mullally on breach of contract, breach of fiduciary duty, and negligent misrepresentation claims, and awarded a total of

$1,932,817.45 in damages. The trial court entered final judgment on the jury's verdict and Mullally now appeals, arguing that CMS failed to submit sufficient proof of damages for the breach of contract claim and that the evidence did not support the jury's verdict with respect to the breach of fiduciary duty and negligent misrepresentation claims. For the reasons set forth below, we affirm.

> When reviewing a trial court's denial of a motion for JNOV ... this Court determines if there is any evidence to support the jury's verdict. Where a jury returns a verdict and it has the approval of the trial judge, the same must be affirmed on appeal if there is any evidence to support it as the jurors are the sole and exclusive judges of the weight and credit given the evidence. The appellate court must construe the evidence with every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict. As long as there is some evidence to support the verdict, the denial of defendant's motion[] for ... JNOV will not be disturbed.

*Caldwell v. Church*, 353 Ga. App. 141, 142 (836 SE2d 594) (2019) (punctuation omitted). See also *Old Republic Nat'l Title Ins. Co. v. RM Kids*, 352 Ga. App. 314, 314 (835 SE2d 21) (2019) (citing same standard for denial of motion for directed verdict); OCGA § 9-11-50. Questions of law, such as the proper measure of damages and the manner in which damages properly may be proven, see *McMillian v. McMillian*, 310

2

Ga. App. 735, 738 (713 SE2d 920) (2011), are reviewed de novo. *Harris v. Martin*, 373 Ga. App. 158, 159 (908 SE2d 17) (2024). Moreover,

> the direction of a verdict is proper only where there is no conflict in the evidence as to any material issue, and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict. When there is opinion evidence, circumstantial evidence, presumptions of fact, or evidence subject to more than one reasonable construction, the appellate courts shall carefully scrutinize the grant of a directed verdict, because such evidence may be construed as providing the "any evidence" creating a jury question.

*Old Republic Nat'l Title Ins. Co.*, 352 Ga. App. at 314–15 (punctuation omitted).

The factual background to the underlying dispute between the parties is recounted in our prior opinion. Here, we set forth only those facts needed to place the parties' current appeal in context.

> Mullally, Lewis N. Lester, Sr., and Robert Colvin formed CMS to provide consulting services to federal and state chartered credit unions, including loan participation opportunities. The CMS operating agreement was executed in May 2016, with each of the three men — Mullally, Lester, and Colvin — holding approximately one-third of the total Class A Units of the business. ...

[T]he Operating Agreement ... included various restrictive covenants, including a non-compete clause and a non-solicitation clause. The non-comp[]ete clause, found in Section 13.2, precludes a member from engaging in "competitive business" while that member "holds any unit(s) and for a period of two years after ... ceasing to hold any unit." Similarly, the non-solicitation clause in Section 13.3 provides, in relevant part, that a member, while "holding units and for a period of three years thereafter," is prohibited from soliciting or attempting to provide services to any person who was a client or prospective client within the three years prior to the member ceasing to hold units.

Mullally was employed by CMS for several years, "where he led all business development initiatives and managed the loan participation desk." In late January 2020, ... Mullally resigned from CMS, but he expressly retained his membership units. Approximately two weeks later, CMS sent a cease and desist letter to Mullally, reminding him of the restrictive covenants, demanding that he cease providing services to CMS clients, and advising him that he needed to account for revenue earned as a consequence of his work. Just days later, [Mullally] filed a two-count complaint seeking a declaration that the restrictive covenants were void and unenforceable against Mullally and his various companies.

[CMS] subsequently answered and counterclaimed, seeking ... both injunctive relief and monetary damages arising out of Mullally's alleged breach of the CMS operating agreement, including the restrictive

covenants.[1] Following extensive discovery ... the parties filed cross-motions for summary judgment as to [Mullally's] claim for declaratory relief; [Mullally] also moved for summary judgment on [CMS's] claims for injunctive and monetary relief arising out of Mullally's alleged breach of the restrictive covenants, arguing that the restrictions were unenforceable as a matter of law or, alternatively, unenforceable against him.

Following a lengthy hearing, the trial court entered an order on the pending motions for summary judgment[,] ... [i]n short, ... concluding that the restrictive covenants are valid and enforceable, though the trial court left the issue of any possible damages to a jury.

*Mullally*, 368 Ga. App. at 603–04(1) (citation modified).

Following remittitur, the matter proceeded to a jury trial. The evidence at trial showed that CMS spent between $5,000 to $10,000 per month for Mullally to entertain and develop relationships with prospective credit union customers. In addition to this benefit, Mullally was paid a monthly $15,000 salary.

Prior to joining CMS, Mullally started an investment advisory business, Mullally Capital Management ("MCM"). In 2018, MCM billed a credit union service

---

[1] CMS also counterclaimed for, among other claims, breach of fiduciary duty and negligent misrepresentation.

organization, Greater Commercial Lending, which at the time was a CMS customer, $100,000 for "consulting services referral." In July 2018, MCM received another payment from Greater Commercial Lending for $1,030,000. According to one of the partners, he knew of MCM, but was unaware that Mullally was using the company to provide consultant or advisory services to credit unions.

In March 2018, Mullally formed another company, Peachtree Loan Consultants, to perform loan referral and loan review services. Mullally directed a CMS employee, Ashley Reece, to create invoices for the loan services Peachtree Loan Consultants provided. In 2018, Peachtree Loan Consultants received $840,000 for loan services from CMS customers, including Greater Commercial Lending. Mullally did not disclose this payment to CMS.

The same day that Mullally resigned from CMS on January 24, 2020, he formed another company, Community Lending Partners, to administer loan placement or loan participation services, similar to the services that he had been providing while at CMS. Two weeks prior to his resignation, Mullally told his partners that he had closed some deals and that revenue would be "flowing to CMS." Instead, the funds for the loan services were paid to Community Lending Partners.

Mullally testified that since leaving CMS, he has done loan business, through Community Lending Partners, with seven credit union service organizations or credit unions that had been CMS clients. Two of these companies, Greater Commercial Lending and US Eagle, accounted for approximately 98 percent of CMS's loan participation revenue; Mullally testified that business from these companies comprised roughly the same percentage of revenue for Community Lending Partners. CMS attempted to retain the business relationship with Greater Commercial Lending and US Eagle after Mullally left, to no avail.

One of the partners calculated that while at CMS, Mullally, as the sole owner of his side businesses, made $1,538,563.42 in loan services fees that would have otherwise gone to CMS had Mullally complied with the operating agreement. The partner further tallied that Mullally made $3,142,798.13 in fees in the 42 months that the operating agreement's restrictive covenants were in effect after Mullally resigned from CMS. CMS provided hundreds of pages of invoices from Mullally's side businesses corroborating this account.

Another partner testified that the loss of this business had a "drastic[]" impact on CMS's financial condition. Specifically, the partner testified that in 2019, CMS's

loan participation revenue "was cut in half from the prior year," from approximately $950,000 to $500,000. After Mullally resigned, the loan business revenues dropped to less than $100,000. This slide in revenue forced CMS to raise capital from other sources, including private investors and "friends and family," to meet its business expenses. Additionally, CMS provided itemized financial statements showing its revenues and expenses from 2016 through 2022. The partner testified that in 2016, CMS had a negative net income of $864,138.25; in 2017, a negative net income of $422,217.48; in 2018, a negative net income of $1,327,127.71; in 2019, a negative net income of $1,463,592.65; in 2020, a negative net income of $897,736.33; in 2021, a negative net income of $113,466.26; and in 2022, a negative net income of $1,135,281.68.

At the close of evidence, Mullally moved for a directed verdict, which the trial court denied.[2] The jury found that Mullally breached: (i) the non-compete clause in the operating agreement from May 9, 2016 through June 8, 2020, and awarded CMS $1,030,000 in damages; (ii) the non-solicitation clause from May 9, 2016 through June 8, 2020, assessing $4,875 in damages; (iii) the non-solicitation clause from June 8,

---

[2] The trial court also denied Mullally's renewed motion for directed verdict at the charge conference.

2020 through June 8, 2023, awarding damages of $892,400.79; (iv) his fiduciary duties to CMS, awarding $666.66 in damages; and the jury further found that (v) Mullally made negligent misrepresentations to CMS, assessing $4,875 in damages. In total, the jury awarded CMS $1,932,817.45 in damages, and the trial court entered final judgment on the jury's verdict. Mullally subsequently filed a motion for JNOV, which after a hearing, the trial court denied. This appeal followed.

1. In his first claim of error, Mullally contends that CMS failed to present any evidence to support an award of damages for breach of contract, and thus, the trial court erred in denying his motions for directed verdict and JNOV. More specifically, Mullally maintains, as he did below, that CMS's claim for breach of contract damages fails as a matter of law because it did not prove its damages with reasonable certainty and did not have a history of profitability. In response, CMS argues that the testimony at trial from Mullally and his former partners, along with the "voluminous" financial records showing the "lost revenue that Mullally diverted from CMS to his competitive businesses," provided sufficient evidence to support the jury's award of damages for Mullally's breach of the operating agreement's restrictive covenants. We

conclude that, when viewed under the "any evidence" standard of review, the record demonstrates that there was evidence from which a jury could find damages.

"Proof of damages is an essential element to ... a claim for breach of contract ... . A failure to prove damages is fatal to a plaintiff's claim." *Niloy & Rohan, LLC v. Sechler*, 335 Ga. App. 507, 510(1)(a) (782 SE2d 293) (2016) (citation modified). As a general rule,

> [t]he measure of damages for breach of contract is the amount which will compensate the injured person for a loss which a fulfillment of the contract would have prevented or the breach of it entailed. That is, the injured person is, so far as it is possible to do so by a monetary award, to be placed in the position he would have been if the contract had been fully performed.

*Caldwell*, 353 Ga. App. at 146(1) (punctuation omitted). "The plaintiff bears the burden of proving its damages by evidence which furnishes the jury with sufficient data to enable them to calculate the amount with reasonable certainty. Proof of damages cannot be left to speculation, conjecture and guesswork." *Am. Infoage, LLC v. Only Solution Software, LLC*, 362 Ga. App. 706, 709–10(1)(a) (870 SE2d 47) (2022) (punctuation omitted).

10

Regardless of how it is categorized, lost profits or lost business opportunities are special damages, see *Toney v. McKee*, 378 Ga. App. 389, 394(3)(c) (926 SE2d 104) (2026), which "are those which actually flow from a tortious act." OCGA § 51-12-2(b). See also *SMD, L.L.P. v. City of Roswell*, 252 Ga. App. 438, 441(2) (555 SE2d 813) (2001) (describing "lost profits" and "lost investment" as "consequential or special damages"), abrogated on other grounds as recognized by *Toney*, 378 Ga. App. at 394(3)(c) n.15.

> Even though the statutory definitions of general and special damages … refer to tortious acts, general and special damages also may be recovered in contract actions if the general and special damages are not remote or consequential (OCGA § 13-6-8) and are such as arise naturally and according to the usual course of things from such breach and such as the parties contemplated, when the contract was made, as the probable result of its breach.

*Imaging Sys. Int'l v. Magnetic Resonance Plus*, 227 Ga. App. 641, 645(1) (490 SE2d 124) (1997) (punctuation omitted).

It is generally true, as Mullally claims, that lost profits may be recovered by a business "only if the business has a proven track record of profitability." *EZ Green Assocs., LLC v. Ga.-Pac. Corp.*, 331 Ga. App. 183, 188(2) (770 SE2d 273) (2015)

(punctuation omitted). At the same time, we have recognized that in certain cases, including that of a new business, such as CMS, "restricting damages to lost profits … would leave [the injured party] without a remedy," and the "injured party is to be placed, as near as may be, in the situation [it] would have occupied if the wrong had not been committed." *Re/Max of Ga. v. Real Estate Grp. on Peachtree*, 201 Ga. App. 787, 789(2) (412 SE2d 543) (1991) (holding that, in breach of contract action, new business without a proven track of profitability could seek damages other than lost profits).

Here, the record contains some competent evidence from which the jury could calculate, with reasonable certainty, CMS's damages arising from the breach of the restrictive covenants. Contrary to Mullally's claim, the evidence in support of damages consisted of more than his invoices reflecting the revenues that he received from his side businesses. In addition to those invoices, the jury was provided CMS's financial statements from 2016 to 2022 showing its revenue and expenses, from which it could tabulate CMS's losses. Moreover, the jury heard testimony that CMS's loan business revenue decreased precipitously from the loss of its seven customers to Mullally's competitive businesses, which caused CMS to borrow additional capital to

meet its expenditures. As such, the evidence of CMS's damages was by no means speculative and was sufficient to prove with reasonable certainty damages flowing from the breach of the restrictive covenants. Accordingly, the trial court did not err by denying Mullally's motions for directed verdict and JNOV as to damages for breach of contract. See *Williamson v. Palmer*, 199 Ga. App. 35, 36(1) (404 SE2d 131) (1991) (upholding non-lost profit damages award for breach of non-compete covenant); *Gaines v. Crompton & Knowles Corp.*, 190 Ga. App. 863, 864(1)(A) (380 SE2d 498) (1989) (recognizing that in breach of contract action, injured party's recovery was not limited to net profits lost through breaching party's conduct, but that injured party could also recover damages for loss of customers).

2. Mullally next claims that the trial court erred in denying his motions for directed verdict and JNOV with respect to the breach of fiduciary duty claim because the operating agreement disclaimed fiduciary duties between the operative members. We discern no error.

"To establish a tort claim for breach of fiduciary duty, a plaintiff must show (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach. Without question, partners owe a fiduciary duty to one

another." *Wimpy v. Martin*, 356 Ga. App. 55, 57(1)(a) (846 SE2d 230) (2020) (citation modified).

Section 4.5(a) of the operating agreement provides in part that "[t]o the fullest extent permitted by the [Georgia Limited Liability Company] Act, no Member or Manager has fiduciary duties with respect to the Company ... other than the contractual obligation of good faith and fair dealing[.]" In the first place, this provision, by its plain terms, does not apply to Mullally's fiduciary duties stemming from his conduct as director, officer, or employee of CMS. In any event, regardless of his role, the jury could have found that Mullally breached his obligation of good faith and fair dealing to CMS when he solicited and provided loan services to CMS customers during his term of employment with CMS, while using a CMS employee to prepare invoices for his side businesses, to Mullally's pecuniary benefit and to CMS's fiscal detriment. This evidence was sufficient to establish that Mullally breached his fiduciary duty to CMS. See *Crippen v. Outback Steakhouse Int'l, L.P.*, 321 Ga. App. 167, 171(2) (741 SE2d 280) (2013) (recognizing that "an agent breaches a duty of loyalty owed to his employer by using his position for his own personal benefit to the detriment of his employer" (emphasis omitted)); *Hanson Staple Co. v.*

*Eckelberry*, 297 Ga. App. 356, 359(1) (677 SE2d 321) (2009) (explaining that "an employee is not entitled to solicit customers for a rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business" in breach of his fiduciary duty (punctuation omitted)).

3. Lastly, Mullally argues that the trial court erred in denying his motions for directed verdict and JNOV as to the negligent misrepresentation claim because CMS failed to present any evidence that it relied to its detriment on any representations by Mullally. We find this argument unavailing.

"[T]he essential elements of negligent misrepresentation are: (1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance." *DaimlerChrysler Motors Co. v. Clemente*, 294 Ga. App. 38, 50(3) (668 SE2d 737) (2008) (punctuation omitted).

Here, the evidence adduced above, including that two weeks before he resigned Mullally falsely represented to his partners that there was a "pipeline" of closed deals, that revenue would soon be flowing to CMS, when instead the funds were paid to Mullally's competitive business, which forced CMS to raise capital from other sources

to meet their business expenses, provided some evidence to support the jury's verdict. Thus, this claim of error fails.

*Judgment affirmed. McFadden, P. J., and Watkins, J., concur.*